Fred D. **GRAY** et al., Plaintiffs,

v.

Fred D. **MAIN**, in his capacity as Judge of Probate of Bullock County, Alabama, et al., Defendants.

**United States of America,
Amicus Curiae.**

**Civ. A. No. 2430–N.**

United States District Court,
M. D. Alabama, N. D.
March 28, 1968.

See also D.C., 291 F.Supp. 998.

Solomon Seay, Jr., Montgomery, Ala., Norman Amaker, Fred Wallace, New York City, for plaintiffs.

Ben Hardeman, U. S. Atty., M. D. Ala., Montgomery, Ala., John Doar, Asst. Atty. Gen., John M. Rosenburg, Alexander Ross, Dept. of Justice, Washington, D. C., Maury Smith, Frank J. Mizell, Montgomery, Ala., W. M. Russell, Jr., Tuskegee, Ala., R. E. L. Cope, Union Springs, Ala., Preston Clayton, Eugaula, Ala., for defendants.

### JUDGMENT AND DECREE

### SUMMARY OF THE PROCEEDINGS

PITTMAN, District Judge.

The plaintiff, Fred Gray, was a Negro candidate in the May 31, 1966, Democratic Party Primary for nomination as Representative Place No. 2, in the Ala-bama House of Representatives, District 31, composed of Macon, Bullock, and Barbour Counties.

Plaintiffs Williams, Huffman, McGee, and Ellis were Negro candidates in the same Primary for elective offices in Bullock County.

The other plaintiffs were Negroes and qualified electors or poll watchers for one of the aforesaid candidates in the same Primary in one of the three named counties. These plaintiffs bring this action in their own behalf and on behalf of other similarly situated Negroes in their respective counties as representatives of the classes they represent.

The defendants are the Probate Judge of Bullock County, Alabama; the Register in Equity of the Circuit Court of Barbour County; the Alabama State Democratic Party Executive Committee and its Chairman. Also named as defendants are the County Democratic Party Executive Committee and its Chairman, and the Chairman of the Board of Registrars of each of the three named counties respectively.

This action was commenced following the May 31, 1966 Democratic Party Primary in Alabama including these three counties. On June 29, 1966, the plaintiffs filed their Bill of Complaint together with a motion for preliminary injunction and a temporary restraining order, without a hearing and without formal notice pending a plenary hearing of this cause. The basic complaint is that they were deprived of rights guaranteed by the Fourteenth and Fifteenth Amendments to the Constitution of the United States and the Voting Rights Act of 1965. (42 U.S.C. Secs. 1971 and 1973.)

On June 30, 1966, Judge Frank M. Johnson, Jr., Chief Judge of the Middle District of Alabama, United States District Court, concluded that "in order to insure that the records relating to these primary elections are preserved plaintiffs' motion for a temporary restraining order should be granted." In the same order he enjoined the three named Dem-

ocratic Party Executive Committees and their Chairmen, officials, agents, etc., from destroying altering, or multilating any of the poll lists, official voting lists, ballots, or other records relating to the May 31, 1966 Primary Election until such time as plaintiffs could complete discovery and obtain a full hearing.

On July 5, 1966, Judge Johnson designated the United States as Amicus Curiae and as a party to the suit. The undersigned made all rulings thereafter. Various motions for discovery were filed by the plaintiffs and the United States on, to wit, July 26, 1966, August 1, 1966, August 18, 1966, August 19, 1966, August 22, 1966, September 8, 1966, and September 19, 1966. Substantially all of the motions and orders involving discovery were granted as requested. Additional discovery was granted in a pretrial order dated January 25, 1967, and supplemental orders of March 9, 1967, and April 24, 1967. The plaintiffs' motion to inspect and copy reports made to Judge Johnson in United States v. Ala., Civil Action No. 1677–N, was denied. However, later this information was made available to the plaintiffs by the defendants from their records in compliance with an amendment to a pretrial order. In most instances the defendants did not oppose the discovery, but consented.

Plaintiffs invoked the jurisdiction of this court pursuant to 28 U.S.C. Sec. 1343(3) and (4) contending that this was an action to redress the deprivation, under color of the law, statutes, regulations, customs, and usages of the State of Alabama of rights, privileges, and immunities secured by the Fourteenth and Fifteenth Amendments to the Constitution of the United States, 42 U.S.C. Sec. 1971, and 42 U.S.C. Sec. 1973 (Voting Rights Act of 1965). Plaintiffs also contended that the action was authorized by 42 U.S.C. Sec. 1983.

The various motions to dismiss filed by the defendants raised two basic questions involving the plaintiff's standing to sue and the court's jurisdiction. The first was whether a private litigant has standing to assert the substantive portions of 42 U.S.C. Sec. 1973 (Voting Rights Act of 1965) and secondly, whether 28 U.S.C. Sec. 1344 expressly denies this court's and other United States District Courts' jurisdiction in such a controversy. The argument of the defendants that actions by private individuals are not authorized, since Section 1973j (d) of Title 42 confers specific authority upon the Attorney General of the United States to institute proceedings for the purpose of enforcing the rights guaranteed by Section 1973, was rejected by Judge Johnson in denying the motions to dismiss. The court stated at that time that nothing in the Voting Rights Act precludes the exercise or dilutes the rights conferred by Section 1983 Title 42, since Section 1983 seems clearly to permit individuals such as the plaintiffs to bring an action alleging violation of Section 1973i.

The defendants also argued that this court did not have jurisdiction based upon 28 U.S.C. Sec. 1344. As the court pointed out in the order of September 7, 1966, this suit was not an action to recover possession of any office as contemplated by Section 1344, but rather it is an action to redress certain alleged deprivations under color of state law of the Negroes' right to vote with jurisdiction specifically conferred by 28 U.S.C. Sec. 1343(3) and (4). It was also noted that although the relief could possibly involve ordering a new election, the determining factor is not whether one candidate or another should have been elected but whether the holding of a new election is an appropriate means to remedy the discrimination of which the plaintiffs complain.

On October 26, 1966, the plaintiffs filed a motion seeking a delay in the general election of November 8, 1966, until a decision was had in this cause. On October 27, 1966, Judge Johnson denied the motion.

On February 27, 1967, the Bullock County defendants filed a motion for summary judgment. At the request of

the plaintiffs, the court extended the time for answering this motion until April 1, 1967. On April 6, 1967, oral arguments were had on the motion for summary judgment and on April 24, 1967, the court denied the motion. On April 11, 1967 the plaintiffs filed motions to extend discovery, to cite for contempt defendants Yon, et al., the attorneys for defendants, and to appoint the United States as special master. The plaintiffs withdrew their motion for contempt against the attorneys and defendant Mangham. The court granted the discovery and later denied the motions with reference to the special master and contempt against the other defendants, but there is pending a motion to set aside the court's order re contempt against the other defendants.

A trial of the case on its merits was set for May 2, 1967. At the April 24, 1967 hearing the plaintiffs requested a continuance to enable them to have additional time for discovery. This was granted and the cause was set for trial on July 10, 1967, and a further clarification of previous discovery on behalf of the plaintiffs was made.

Subsequently, the plaintiffs advised they would be ready May 2, 1967, and this cause was heard orally commencing May 2, 1967, for four days, and beginning July 24, 1967, for nine days. Seventy-two witnesses were heard and 101 exhibits were introduced.

When both plaintiffs and defendants rested on August 4, 1967, the court gave the plaintiffs 30 days to exercise an option to investigate and to offer surrebuttal on the evidence which defendants had offered concerning 351 white persons identified as being on the registrar's list of Bullock County, but who at that time were not physically residing in Bullock County. On August 31, 1967, the plaintiffs gave notice to the court they desired to offer surrebuttal and made a motion for discovery without notice. The court conditionally granted the discovery motion. On October 19, 1967, the plaintiffs gave notice of withdrawal of the surrebuttal request. It has been indicated the withdrawal was after a team for plaintiffs had made further investigations. Oral arguments were held November 20, 1067, and the cause was taken under submission.

### STATEMENT OF THE CASE

The relief sought by plaintiffs can best be placed in four categories or four major forms:

(1) To have the Board of Registrars of each county *purge* the registration lists.

(2) To have the court enjoin the defendants from receiving, canvassing, or tabulating illegally cast ballots in the May 31, 1966 Primary Election, and requiring the respective Executive Committees to refrain from certifying those persons selected in that election as the Democratic nominees. (This question is now moot.)

(3) To have the court enjoin the defendants from failing to refusing to hold a Democratic Party run-off election in Bullock County (to set aside the election as to the plaintiffs in Bullock County and to have a new election called), and to have the court set a date for a new run-off election.

(4) In the new run-off election, and in all future elections, to have the court order the election officials to refrain from inhibiting Negro voters in the free exercise of their right to vote.

In connecton with the above relief, the court was asked to determine:

(a) Whether or not there are more white persons qualified to vote than white persons of voting age in Bullock County, and to what extent *non-resident persons* were illegally *permitted to vote*.

(b) Whether names of *deceased persons* appeared *on the poll lists*.

(c) Whether or not white persons were permitted to cast *absentee ballots illegally*.

(d) Whether the names of qualified *Negro voters* were *omitted from the poll lists*.

(e) Whether illiterate *Negro voters* were *denied assistance* and thus prevented from, or hindered in, casting their ballots.

(f) Whether *poll watchers* for Negro candidates were *excluded or harassed* at various polling places.

(g) Whether *Negro electors* were *prevented from casting challenged ballots.*

The relief sought is not an action to recover possession of the offices sought by the Negro candidates in the counties involved, and no theory has been pursued nor considered by the court that any of the Negro candidates are entitled to the offices they sought.

There is *no claim* here that any of the Negro candidates are *entitled to the offices* they sought. Indeed, the plaintiffs have not alleged jurisdiction under 28 U.S.C. § 1344. Instead, the suit is an action to redress named deprivations of the Negroes' right to vote.

Section 1344 of Title 28, United States Code, provides in pertinent part:

> The district court shall have original *jurisdiction* of any civil action to recover possession of any office, except that of elector of President or Vice President, United States Senator, Representative in or delegate to Congress, or *member of a state legislature*, authorized by law to be commenced, wherein it appears that the sole question touching the title to office arises out of denial of the right to vote, to any citizen offering to vote, on account of race, color or previous condition of servitude. (Emphasis added.)

The gravamen of the complaint is that defendants have engaged in acts, the purpose and effect of which were to dilute the voting strength of Negro voters in Barbour, Bullock and Macon Counties on account of race. Election officials in the three aforementioned counties are alleged to have permitted numerous white persons in said counties to cast illegal absentee or regular ballots with the purpose of increasing the voting strength of the white community in those counties

and diluting the voting strength of the Negro population of those counties (paragraph VIII). Defendant Boards of Registrars of Bullock, Barbour and Macon Counties and their chairmen are alleged to have failed and refused to purge the registration lists of their respective counties for the purpose and with the effect of increasing the apparent ratio of white to Negro voters in their respective counties and providing a vehicle whereby numerous illegal votes of white persons were received and counted in the Primary of May 31, 1966 (paragraph VI).

The Fifteenth Amendment to the Constitution provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

The Supreme Court recognized in Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 that:

> * * * the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

In Sims v. Baggett, 247 F.Supp. 96, 109 (M.D.Ala.1965), this court stated that:

> [S]ystematic and intentional dilution of Negro voting power by racial gerrymandering is just as discriminatory as complete disfranchisement or total segregation.

■ Where the dilution has a racial purpose or effect, then Fifteenth Amendment rights are denied. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Thus, if the defendants committed the alleged actions acting under color of state law, which diluted and hence abridged plaintiffs' right to vote without distinction as to race, such acts would be in violation of the Fifteenth Amendment and 42 U.S.C. § 1971(a).

Section 11(a) of the Voting Rights Act of 1965, 42 U.S.C. § 1973i(a) provides:

No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of this subchapter or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

■ The term "vote" or "voting" is defined in Section 14(c) (1) to include "all action necessary to make a vote effective in any primary, special, or general election * * * and having such ballot counted properly and included in the appropriate totals of votes cast * * *." A vote is not properly counted when, through dilution, it is not afforded its full weight and a total is not "appropriate" if it included ballots illegally cast in violation of the Fifteenth Amendment, 42 U.S.C. §§ 1971(a) and 1973i(a). Therefore the Act bars state officials from committing acts which would prevent the vote of a qualified person from being made effective or properly counted and included in the appropriate totals. Defendants were alleged to have committed acts with the purpose and effect of diluting the votes of Negro citizens and preventing plaintiffs' votes from being made effective and from being properly counted and included in the appropriate totals. Such acts if committed as alleged would have abridged plaintiffs' rights under 42 U.S.C. Sec. 1973i(a).

What has been considered is whether or not the evidence in this case reflects discriminatory acts to an extent that a new primary election should be held *in Bullock County*, for the county offices hereinbefore set out, and in Macon, Bullock, and Barbour Counties for Place No. 2, House of Representatives, District 31, and whether the holding of a new election is an appropriate means to remedy the discriminations of which these plaintiffs complain. A recount of votes in any of the three counties is not appropriate.

All *other* relief sought is to prevent a repetition of the violations alleged to have occurred on May 31, 1966.

## MACON, BULLOCK, AND BARBOUR COUNTIES

The court will first consider whether or not the election to Place No. 2, House of Representatives, District 31, comprised of Macon, Bullock, and Barbour Counties, should be set aside.

The complaint and all written pleadings indicate that the plaintiffs only sought to have the election in Bullock County set aside and not in Barbour and Macon Counties (in the complaint the prayer for relief, 2(c), Barbour, Bullock and Macon County Democratic Executive Committees and their Chairmen were sought to be enjoined from receiving, canvassing, and tabulating any and all absentee and regular ballots illegally cast May 31, 1966, in House District 31. This question is now moot.).

At the pretrial conference leave was granted the plaintiffs to amend their pleadings so as to seek the same relief in reference to Macon and Barbour Counties in voiding the election for House of Representatives, District 31. The court did not see how it could declare an election void in one county of a three county district without ordering a new election in the entire district comprising all three counties. The plaintiffs only sought a recount in Macon and Barbour. No written amendment has been filed. The court takes the view that it could mold its relief under this status of the case to cover the three counties. However, the great thrust of plaintiffs' presentation and arguments were centered on Bullock County.

## MACON COUNTY

A stipulation has been entered into between the Macon County defendants and the plaintiffs which is incorporated and made a part of this decree in the Appendix.

In this county there were 6,610 votes cast (Plaintiffs' Exhibit No. 2), in the

May 31, 1966 Primary. It is common knowledge that several Negro candidates were nominated and subsequently elected. No evidence was offered of harassment to poll watchers, nor of tabulation of illegally cast ballots by white persons, nor of refusal to assist Negro voters, nor of refusal to permit Negroes to cast challenged ballots or to count them, nor that more white voters cast ballots than were legally entitled to vote.

There was some evidence offered of improper certification of white absentee ballots, but it was without racial overtones.

## BARBOUR COUNTY

With reference to Barbour County, no evidence was offered that more white persons voted in the election than those who had a right to vote there, nor of any refusal to assist Negro persons, nor of any refusal to permit Negro electors to cast challenged ballots, nor where cast, to count them. There were a few isolated complaints of Negro poll watchers not being allowed to use voter lists, pen and paper, etc. These complaints were promptly adjusted to the mutual satisfaction of all involved.

The 1960 census reveals 7,338 white persons of voting age. Plaintiffs' demographic evidence based on a declining population as reflected in census figures over a thirty year period, indicates there were 6,867 white persons of voting age in the county as of April 1, 1966. The defendants' evidence indicates there had been a substantial rise in the population of the county between 1960 and 1966 as evidenced by new industries creating new employment in excess of 1,450 and a 4,000 increase in automobile registration.

The defendants further contend, as did the Bullock County officials, that many persons no longer residing in Barbour County were legally entitled to register and vote. No evidence on this point was presented by either side. In view of the dearth of evidence, this court is unable to make any accurate finding as to how much of the indicated excess of registered whites over the indicated white adult population represents irregular excess registration. It is significant however, that the plaintiffs have not produced any evidence, and they do not insist that any improper voting occurred as a result of any excess registration. Barbour officials permitted Negro poll watchers to use registration lists on election day and with the exception of two or three complaints which were promptly and satisfactorily resolved, no restrictions whatever were placed on the poll watchers' activities. Neither their supervision at the polling places nor their inspection of voting records have revealed a vote cast by any person not legally registered.

The complaint charged that the Barbour County Registrar, James Teal, permitted illegal absentee voting by white persons for the purpose of defeating plaintiff Fred Gray. A list of 150 persons allegedly casting illegal absentee votes was offered. No evidence was introduced indicating any of those ballots to have been fraudulent. Principally, two types of irregularities are charged: (1) That Mr. Teal, or members of his staff, upon request went to the homes of incapacitated persons voting absentee and helped them to complete the voting procedure and that the ballots were not returned to his office by United States mail, but by persons, contrary to Title 17, Code of Alabama, Section 64(24d). This was done as an accommodation to the general public. The court does not find there were any racial overtones connected with these actions. The evidence is without conflict that throughout the May election the services of Mr. Teal's office, including the above action, were equally available to members of both races. (2) A question was raised as to whether or not one of the doctors formally appeared before a notary, or if he signed the certificate of the person's health and placed it with his other papers which his secretary, or a notary outside his office, notarized. The plaintiffs' evidence is uncertain, but there is no

doubt, even if irregular, that these were not racially discriminatory acts.

■ Plaintiffs challenged ballots in several Barbour County polling places as being in violation of Title 17, Code of Alabama, Section 175(2) which prohibits anyone other than the voter from signing the sign-in sheet unless an illiterate requests assistance. Plaintiffs' Exhibit No. 33 and No. 35 establishes that twenty-five couples, fifty husbands and wives, signed in for one another. This is a technical violation, but one which the plaintiffs concede to have been unobjectionable. Plaintiffs' Exhibit No. 32 establishes that at Beat 10, Box 1, 121 voters, and, Plaintiffs' Exhibit No. 34, that at Beat 14, Box 1, 20 voters were signed in by an election official at the respective beats. All 121 ballots, Plaintiffs' Exhibit No. 32, were challenged. The great majority of those persons were personally known to the clerks signing the sheets and every voter was accounted for by some election official. All 121 persons personally marked their own ballots. Witness Freeman, a poll watcher for plaintiff Gray at this beat and box, testified the results were correct. The procedure at this box was in variance with statutory procedure and all parties agree it should not be condoned. There is insufficient evidence to show that these clerical irregularities were racially motivated, or the product of any fraudulent intent.

■ Finally, reference has been made to the changing of beat assignments of many Negroes between registration and the time of election. Between April 1965 and April 1966, approximately 2,500 to 3,000 Negroes were registered, many of whom were illiterate and with rural addresses. The exact location of their beats and residences were unknown and the Registrar either used Post Office addresses or guessed at the beat assignment. In early September 1966, the Probate Judge published lists of all registered voters showing the beats as initially assigned. Many were incorrect and numerous complaints were received. The Probate Judge employed Negroes to help correct the assignments and a supplemental list was published prior to the May elections. On the May 31 election very few complaints concerning beat assignments were made. The court finds that changes in beat assignment were an aboveboard effort and a necessary adjunct to the massive registration for the preceding year and were not intended to have, and did not, in fact, have any burdensome effect upon the Negro voting strength in the May elections.

To summarize, the plaintiffs have introduced evidence which indicates some clerical irregularities in regard to absentee ballots and sign-in sheets. Beat assignments of many Negroes were changed. There is nothing to indicate that any of these actions were done with the fraudulent intent to dilute Negro voting strength and no evidence which shows that such dilution did occur. The technical violations indicated have been in existence for a long period of time, and the court finds these to have been free from any racial implications.

## BULLOCK COUNTY

The court now considers the case against the Bullock County defendants with reference to voiding the May 31 election and the prayer to set a date for a new run-off election.

## CHARGE OF EXCESS WHITE REGISTRATION

Plaintiffs' demography expert projected the Bullock County population as of May 31, 1966, for white adults of voting age, at 2,395. The evidence shows that there were 2,823 white adults (see Defendants' Exhibit No. 3 and No. 14 and Tables 1 and 2) *registered to vote* as of this date. On the hypothesis that the demographic expert's figures are correct, this would make 428 (2,823 voters minus 2,395 population equals 428) more white people registered than those present according to a census count, the beginning basis of the expert's testimony, 2,482 white persons voted May 31, or 87 more than the census population (2,482 whites

voted minus 2,395 white population equals 87).

By cross-examination of the plaintiffs' expert, and by reference to "The Census Takers Enumerators Reference Manual" (defendants' Exhibit No. 10), it was established that military personnel and college students, for the purposes of census taking, are usually counted at their military base and college residence.

The defendants' evidence tended to show that as of May 31, 1966, the following existed:

| | |
|---|---|
| Members of Armed Services (Including wives & other voters) ........ 77 | |
| College students ....... 33 | |
| 110 | sub-total |
| Residents nursing homes, hospitals, etc., or living with relatives for reasons of health ..... 27 | |
| Federal & State employees ............ 76 | |
| School teachers ........ 49 | |
| 262 | sub-total |
| Persons absent from county for occupational or other related reasons ............... 99 | |
| 361 | Total |

The testimony covered seven of nine (reduced from eleven by consolidation to nine) beats in the county and constituted 15.2321% of the white voters registered in the boxes covered. Assuming this was an accurate sample and applying it to all beats, 2,823 total white registered voters less 15.2321%, or less 430 voters not included in the census equals 2,393.

| | |
|---|---|
| Total white registered voters .................. | 2,823 |
| Less 15.2321%—Voters not included in the census .................. | 430 |
| | 2,393 |

It is contended this accounts for the excess white adult population registered over the plaintiffs' expert's white adult population projection.

The court is reasonably satisfied that the 110 military and college students would not be included in the census.

It is common practice for many persons in federal and state employment to retain their place of voting in their county of origin.

Many school teachers leave home for the school year and return during the summer months or on weekends, and retain their voting at their home of origin. People who are in nursing homes, etc., out of the county, often retain their voting places at their home of origin.

Adding all of these groups to the 110 military and college students would make a total of 262 persons by actual count in seven of the nine beats.

There were 99 in seven of the nine beats white persons absent from the county for occupational or other related reasons. A projection to include all beats would make this figure approximately 118. We can say with reasonable certainty that of the 428 excess voters registered who would not have been included in the census figure, all but 118 were entitled to be registered.

Whether or not these 118 persons were domiciled in Bullock County under Alabama law is less certain than the previously discussed categories. The Alabama Courts make a distinction between domicile and those physically present in a county.

█ A state has the power to impose reasonable residence restrictions on the availability of the ballot. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed. 2d 675 (1965). By statute, the State of Alabama requires as a prerequisite to the right to vote that the elector shall have been a resident of the state for at least one year, in the county six months, and in the precinct or ward three months immediately preceding the election at which he offers to vote. Title 17, Section 12, Code of Alabama, 1940. Although general rules and definitions as to the meaning of the term "residence" for voting purposes may be laid down by the courts, there can be no absolute cri-

terion by which to determine a person's actual residence. The Supreme Court of Alabama has held that "* * * the terms 'legally resides', 'inhabitant', 'resident', etc. when used in connection with political rights are synonymous with domicile." Mitchell v. Kinney, 242 Ala. 196, 5 So.2d 788, 793 (1942). The court has also noted that "Domicile of the elector is a mixed question of law and fact, dependent upon the intention and acts of the elector." Pope v. Howle, 227 Ala. 154, 149 So. 222, 223 (1933).

In Wilkerson v. Lee, 236 Ala. 104, 181 So. 296, 298 (1938) the Alabama Supreme Court held:

> A voter having acquired a legal residence, been duly registered as a voter of the county and precinct or ward, and paid his poll tax therein for the year in which the election is held, may retain such residence until he has abandoned and removed therefrom with the intent to become a resident elsewhere. Temporary absence from one's residence for the purposes of his employment and the like, without the intent to abandon the home town and acquire a domicile elsewhere permanently, or for an indefinite time, does not forfeit his right to vote. Pope v. Howle, 227 Ala. 154, 149 So. 222; Caheen v. Caheen, 233 Ala. 494, 172 So. 618, 8 Alabama Digest, Elections 264, ☞72.

Section 17 of Title 17, Code of Alabama, 1940, provides:

> Residence not acquired or lost by temporary absence.—No person shall lose or acquire a residence either by temporary absence from his or her place of residence without the intention of remaining, or by being a student of an institution of learning, or by navigating any of the waters of this state, the United States, or the high seas, without having acquired any other lawful residence, or by being absent from his or her place of residence in the civil or military service of the state, or the United States; neither shall any soldier, sailor or marine, in the military or naval service of the United States, acquire a residence by being stationed in this state.

The Supreme Court has also pointed out that the statute quoted above "* * is but a recognition of established principles concerning domicile * * *." Ex parte Phillips, 275 Ala. 80, 152 So.2d 144, 147 (1963).

■ Physical presence is by no means an absolute prerequisite in determining a person's residence or domicile for the purposes of voting. As the Supreme Court of Alabama pointed out in the case of Wilkerson v. Lee, *supra*, a teacher may vote in his hometown notwithstanding the fact that he teaches school outside the election district if he can show that he does not intend to change his residence.

The Alabama Supreme Court has also observed that voting is indicative of intention in determining domicile. This, of course, involves a circular argument. The Court stated in Ex parte Weissinger, 247 Ala. 113, 22 So.2d 510, 514 (1945):

> In passing, it may be well to here observe that payment of poll tax and voting is indicative of intention with respect to the question here involved and is regarded as importantly bearing upon the place of domicile. 28 C.J.S. Domicile p. 41 § 17, subsec. d(3) 'The domicile of a man will usually be in the place where he votes.' 2nd Schouler, Divorce, 6th Ed. § 1497, p. 1747. Exercising the right of elective franchise dependent upon citizenship and domicile, is regarded as having weight in settling the question of a person's legal residence. Such act is a deliberate public assertion of the fact of residence and is said to have decided preponderance in a doubtful case upon the place the elector claims as, or believes to be, his residence. Cooper's Adm'r v. Commonwealth, 121 Va. 338, 93 S.E. 680; Wolf v. McGavock, 23 Wis. 516; First Nat. Bank v. Tate, 116 W.Va. 138, 178 S.E. 807.

It is quite likely that those listed as living out of the county for occupational

or related reasons, or a substantial number of them, could succeed in maintaining their voting in Bullock County in litigation specifically arising from their right to vote there under Alabama law.

It is common knowledge that because of home ties, friends, property interests, nostalgia, inertia, etc., a common practice has arisen where many persons leave their home of origin and probably will not return, but continue to vote and maintain voting status in the home of origin.

There is little evidence, other than by inference, that the registration of these voters was racially orientated, but, on the contrary, the registration was an outgrowth of a long-standing common practice unrelated to racial questions. In addition, the opportunity for surrebuttal given to the plaintiffs with a reasonable period for investigation to challenge these voters, and indications that investigations were made but no further evidence was offered, gives rise to the assumption that worthwhile evidence to challenge these voters could not be found.

■ Any inference that the mere existence of these names on the voter registration list when reasonably explained by the defendants is insufficient evidence to place these registrations within the category of racially discriminatory practices as alleged in the Bill of Complaint to void this election.

### PLAINTIFFS' CLAIM MAY 16TH REGISTRATION ILLEGAL

Initially, the plaintiffs contended the May 16th registration was an illegal one in that it was not on a regular registration day, many of the 210 white registrants were registered by stand-ins, that is, the registrant did not personally appear, and out of county white adults were brought in and registered, all in order to maximize the white vote and dilute the Negro vote in the May 31st Primary. (See page 21 of Plaintiffs' Brief and Submission In Response to Defendants' Motion for Summary Judgment, filed April 3, 1967.)

Title 17, Section 27(1), Code of Alabama, provides:

The board of registrars of every county of the state of Alabama shall be in session at the court house, or one of the court houses of their county, on the first and third Mondays of each month for the purpose of registering all persons in the armed forces * * , and all other persons otherwise qualified under the law of the state of Alabama to register. * * * "

May 16, 1966, was a third Monday and it was not excluded under Title 17, Section 27(2) which prohibits registration "within ten days prior to any primary." It is clear this was a regular and legal registration day.

■ 194 Negroes and 210 white persons were registered on this date. It appears both races in a campaign which was polarized, white for white candidates and Negro for Negro candidates, had successful, practical and favorable political results on May 16th in registering prospective voters. The charge of stand-ins fails for lack of sufficient evidence.

■ Plaintiffs contend stand-ins were used for several voters with serious illnesses. It was argued that these voted by absentee ballot because of serious illnesses and therefore it was unreasonable that they appeared in person to register only two weeks prior thereto. The suspicion was understandable. Alabama law makes a provision for absentee voting but there is no provision for absentee registration. Given the context of this election, the explanation that these people would make the extreme effort to register but naturally use the less difficult means of voting is accepted. There is no evidence to support the plaintiffs' contention other than the inference.

### PLAINTIFFS' CLAIM 86 WHITE PERSONS PURGED IN 1962 STILL ON VOTER REGISTRATION LIST OF BULLOCK COUNTY MAY 31, 1966

Plaintiffs' Exhibit No. 28 consists of extracts from the purge book of Bullock

County for the years 1962 through 1966. Plaintiffs' Exhibit No. 29 is a list made by the plaintiffs. This list reflects names purged in the Board of Registrars purge book but still on the Probate Judge's registration list as published in the local newspaper on April 11, 1966.

The plaintiffs contend there were a total of 181 names in the April 1966 newspaper voter registration list which should have been excluded. These had been entered in the Board of Registrar's purge book during the period 1962 through 1966. Eighty-six of these 181 were entered in the purge book in 1962.

The plaintiffs contend that either the names were re-entered on the Voter Registration List after purging or the Probate Judge did not purge his list after purging by the Board of Registrars.

The defendants offered Exhibit No. 19 in answer to the list. Plaintiffs specifically argued 15 of these. Several examples of plaintiffs' challenge and defendants' answer are as follows, to wit:

Mr. and Mrs. A. H. Barnett. This is a case of father and son with the same name. The father in 1964 was purged. The son, by the same name, has been a practicing dentist for several years in Bullock County, and is a member of the School Board.

Mr. and Mrs. D. Arnold Caylor. This is an incident where there are three generations carrying the same name, D. Arnold Caylor I, D. Arnold Caylor II, and D. Arnold Caylor III. Difficulty arises since D. Arnold Caylor II and D. Arnold Caylor III both sign as "Jr.". An examination of the birthdates as recorded by the Board of Registration clears up this discrepancy. The court is satisfied that the Mr. and Mrs. Caylor who voted had not been purged and were regularly registered and entitled to vote.

By checking birthdates, it is clear that the James R. Moore in Beat 3 was purged and did not vote in the May election. The James R. Moore on the poll list was registered in Beat 8. His birthdate clearly distinguishes him from the James R. Moore purged and now registered in another county.

The defendants admit that 9 of the 181 persons challenged, 5 white and 4 Negro, were erroneously carried on the voter registration list and should have been purged.

The basic problem with reference to all of the remaining persons who plaintiffs claim should have been purged arises from a practice of the Board of Registrars of entering names in a purge book and also striking through the names of those purged in the precinct book, the registration list, and the practice of orally passing the names of those finally purged on to the Probate Judge.

The defendants contend that the practice of the Board of Registrars has been to make the entry in the purge book when *notice* to purge is published in the newspaper as required by law. If the voter is finally purged, the name is struck through in the precinct book thereby removing his name from their voter registration list. This is required by Title 17, Section 44, Code of Alabama 1940. There are 106 names entered in the purge book but not struck through in the precinct book which appeared on the April newspaper voter registration list. Eighty-six of these 106 were entered in the purge book in 1962. There were only five Negroes registered in September 1961, and massive Negro registration did not occur until the 1965 Voting Rights Act. Little relationship can be attributed to these acts in 1962 and an alleged attempt to maximize the white vote and minimize the Negro vote in 1966.

The massive purge undertaken in 1962, and the resultant outcry by those proposed to be purged, or their families, satisfactorily explains the failure of the Board to follow through with the proposed purges. To prevent suspicion arising from a repetition of confusing purging practices, the decree will specify procedures to be followed.

**220**

## HARASSMENT OF POLL WATCHERS

The principal basis of the charge of harassment of poll watchers arose from the disagreement of (1) the number of poll watchers at a "voting place" or "polling place" and, (2) the use of poll lists or memoranda thereof by watchers.

The court is unable to find where the Alabama Appellate Courts have answered either of these two questions. The arguments and interpretations of plaintiffs and defendants are both reasonable and the action of the poll officials under this status cannot be declared, and should not be declared, arbitrary or wrongful. There was an effort made during the day by the plaintiff Gray, and the attorney for the defendant Bullock County, to reconcile the differences on election day, and in a general way a reasonable, practical practice evolved.

Briefly, the plaintiffs contend that "polling place" as used in Title 17, Section 357, Code of Alabama 1940, which states that a candidate "may have a single watcher *in the polling place*" should be construed in the same manner as the custom and practice which has been used in implementing Title 17, Section 120, Code of Alabama 1940, for appointing election officials "for each place of voting". By custom and practice a set of election officials is used at each machine and each ballot box.

Title 17, Section 126, Code of Alabama 1940, with reference to general elections, states that "a *watcher* * * * be permitted * * * at the place *where the ballots are cast*". The defendants contend there should be a single poll watcher for each candidate at any building where there are machines and/or ballots regardless of the number of machines or ballot boxes in that building. In Beat 3, five watchers times eleven machines, totaled fifty-five watchers. The defendants contend this was an unreasonable amount of congestion and constituted a burden on the voting procedure.

 In Alabama a public official may act on an Attorney General's ruling if the courts have not decided the question. Title 55, Section 228, Code of Alabama 1940, states that "* * * attorney general * * * must give his opinion in writing, or otherwise, on any question of law connected with the interests of the state * * * when required".

Title 55, Section 240, Code of Alabama 1940, requires the Attorney General to render opinions on "any question of law connected with the duties of the * * * Probate judge, clerk of the circuit court, sheriff * * *."

Title 17, Section 120, Code of Alabama 1940, provides that the "judge of probate, sheriff and clerk of the circuit court * * * acting as an appointing board * * * appoint * * * [the election officials] * * * for each place of voting * * *."

Title 55, Section 241, Code of Alabama 1940, provides the written opinion "* * * shall protect such officer * * * because of any official act * * * performed as directed * * * in such opinion. * * *"

Title 55, Section 239, Code of Alabama 1940, provides: "During the absence of the attorney general * * * or when so directed by him, the assistants * * may render official opinions * * * [which] shall have the same force and effect as if performed by the attorney general."

Election procedures were discussed by the Supreme Court of Alabama in Jansen v. State ex rel. Downing, 273 Ala. 166, 137 So.2d 47, 50 (1962). The court made this comment concerning opinions of the Attorney General, "* * * we do not think it inappropriate to call attention to the statutes authorizing county officials to obtain opinions from the attorney general 'as to any question of law connected with' their duties. Code of Alabama 1940, Title 55, §§ 240–242."

 These election officials had been advised of a 1958 opinion of the Attorney General addressed to the Chairman of the Montgomery Democratic Executive Committee which limited watch-

ers to the place where votes were cast regardless of the number of machines or ballot boxes. Considering the time the opinion was rendered, it is likely a racial question was not involved and the prospective election was probably between white candidates. It is recognized that the Attorney General's written opinions are not controlling but merely advisory and simply protect the officer from civil liability. Hill Grocery Co. v. State, 26 Ala.App. 302, 159 So. 269 (1935). The 1958 opinion was not directed to one of the named officers but it had a certain persuasiveness and was due consideration.

As to the question of whether or not the use of poll lists or memoranda thereof by watchers was proper, attention is directed to Title 17, Section 319, Code of Alabama 1940, which provides "any election officer or *any other person who makes a copy of the poll list or any memoranda therefrom, or a list of the persons voting*, or the number of their ballot, or discloses the number of such voter's ballot, shall be guilty of a misdemeanor and upon conviction, shall be fined not less than two hundred dollars."

 In the absence of authoritative court decisions on this point, the initial prohibition by election officials of the use of copies of poll lists albeit made from newspaper publications, and the reading of the penalty for the use thereof by election officials, cannot fairly be said to have been harassment. After the initial disagreement there was a relaxation in the attitude of the election officials in many instances which indicates the disagreement probably could have been avoided, but the relaxation does not make their former action illegal.

This court will not make an interpretation of the law on these two questions at this time since a determination of these issues is not necessary to this decree. It is preferable that an opportunity be given to the Alabama Courts to determine these questions. In an effort to insure a smooth election and a non-recurrence of these disagreements, the court leaves this decree open on these points until such time as these plaintiffs, or one of their class, again seeks elective office in Bullock County. In the event these points have not been determined by the Alabama authorities, this court invites plaintiffs, or one of their class, to seek additional relief to that granted in this decree and this court will determine these issues prior to such an election.

Plaintiffs feared the white population would use floaters on election day. One of the duties of the poll watchers was to prevent, or at least, to report, this practice. There is not the slightest evidence floaters were used to pump up the white vote of the county.

Other duties included checking and reporting if any person voted who was not registered, if any person voted in place of a registered voter who was deceased, if any registered Negro was prevented from voting or was omitted from the poll list (see Appendix), if any illiterate Negro was refused help in voting (see Appendix), if undue influence was exerted upon any Negro voter, or if Negroes were prevented from casting challenged ballots. None of these things occurred.

The evidence clearly establishes, and the plaintiffs agree, that the poll watchers were permitted without harassment or obstruction to check the machine totals and be present at the tallying of paper ballots after the voting was concluded. There was no contention at the final arguments that any tally was fraudulently, improperly, incorrectly, or discriminatorily made or reported.

There were several flareups and disagreements between poll watchers and election officials. The conduct of the Negro poll watcher who continued to place his ear against the voting machine at the Armory and the poll watcher who discourteously continued to poke the lady election official to attract her attention, are examples of the abrasive conduct by the poll watchers. Mr. Adams, in his use of strong language and muttered re-

marks, provided the principal example of abrasive conduct on the part of an election official.

■■■■ 4,987 people voted in 9 beats consisting of 16 voting machines and 8 ballot boxes. It is historically true in rural areas that places to vote are in stores, portions thereof, or other similar makeshift accommodations having nothing to do with racial discrimination. There is tension in any election. In this election Negro candidates and Negro voters were pitted against white candidates and white voters. It is a welll known reality that poll watchers are partisan and their purpose is to protect their partisan interest. Large groups are difficult to manage. The election officials were charged with managing large groups of people and maintaining a certain degree of decorum and order. Reasonable discipline was necessary to accomplish this or the whole voting procedure would have suffered a breakdown. The court finds that there was sufficient provocation to bring into play disciplinary efforts. Those in charge of any situation must be willing to accept the burden of controlling the procedure which often entails discipline and making many on-the-spot disciplinary decisions. Such officials are properly under the duty to discharge their disciplinary function evenhandedly and according to the law, but it is difficult for persons at a later time, removed from the feel and atmosphere of a given situation, to properly pass judgment on what was, or was not, done according to conflicting testimony. Before such officials are unduly criticized, or their acts labeled improper, it should be clear that their acts were unduly harsh, illegal, or arbitrary. This was not the case in Bullock County.

■■■■ The instance of closing the restrooms at the Armory when Negroes wanted to use this facility was petty. Limited restroom facilities may not be sufficient to accommodate everyone who wants to use them, but whatever use is made available, must be available without regard to race or color and should not be closed just to avoid their use by members of the Negro race. This instance of discrimination is insufficient to warrant the voiding of an election, but is a circumstance which creates needless friction and promotes suspicion of all other activities.

There was restriction by election officials of the use of pens, pencils, and paper, and relief is given in this decree to correct this situation.

Were the poll watchers, because of race, harassed so that their efforts were unduly burdened? This court finds they were not.

## NEGRO VOTING BEAT ASSIGNMENTS CHANGED

The Board of Registrars originally made the beat assignments. Plaintiffs contend numerous Negro voters' beat assignments were changed by the Probate Judge's office. The contention ranged downward from 214 initially (Plaintiffs' List A) to 141 later (Plaintiffs' Exhibit No. 22).

Over the years the Probate Judge's office has made corrections in beat assignments when it was ascertained the assignments by the Board of Registrars were in error. Since the Board does not have a permanent staff this is probably the most practical way of handling these corrections. From a reading of the applicable statutory provisions, there is some question whether the Probate Judge has authority to change beat assignments. Title 17, Section 54, Code of Alabama 1940, provides the Board shall "make a copy of the list of names registered, stating the residence * * * of the persons registered by precincts, by district or other subdivisions * *." which is to be returned to the judge of probate to be alphabetized and certified to the Secretary of State. Language in Sections 38 and 40, however, might be interpreted as authorizing the probate judge to correct assignments as distinguished from simply certifying the list exactly as forwarded by the registrars: " * * * the judge of probate shall,

from the registration list returned to his office * * * make correct alphabetical lists of all the qualified electors registered by precincts, * * * by districts or * * * subdivisions thereof * * * which lists shall be certified by him officially to be full and correct copies of the lists of registered electors for each of such precincts, districts, wards, or other subdivisions, respectively * * * as the same appears from the returns of the board of registrars * * *."

The massive Negro registration following the Voting Rights Act of 1965 had placed a tremendous burden on the Board of Registrars. In a great many cases they had been forced to guess at the proper beat assignments from the new registrant's rural mail delivery routes. Given this situation, it is understandable that many incorrect assignments resulted.

The court finds that the changes of beat assignments were a natural outgrowth of the large scale registrations during 1965 and 1966 and followed a normal practice, and were in no way motivated by any racial considerations.

It was established (Defendants' Exhibit No. 4) that the changes of beat assignments were published by the Probate Judge prior to the election, to wit, April 14, 1966, in the Union Springs Herald. This was in accordance with Title 17, Section 38, Code of Alabama 1940. The election day voter lists on both May 3 and May 31, carried the same assignments as the published list. Since many of the new Negro registrants were illiterate, some confusion arose, but it was not appreciable and the evidence indicates that no Negro was unable to vote due to the published changes nor that any change was incorrect. Because of the beat changes there were 17 challenged ballots but all were counted.

■ The court finds that these Negroes' right to vote was not significantly burdened nor was this a racially discriminatory action by the Probate Judge. An order will be incorporated in this decree setting up procedures to minimize such future suspicions.

## PURGING OF NEGRO VOTERS

Plaintiff Huffman and witness McGee testified with reference to a different basis being used for purging Negroes than that used for purging whites. Plaintiffs' Exhibit No. 58 was a newspaper notice published in February of 1966, of intent to purge 29 persons. They identified 11 of the 29 as Negroes. These 11 had either left the county temporarily or longer and were purged.

There were complaints among the Negro population that they were not being treated on the same basis as the whites. There was no evidence offered to indicate any objection was made after the notice to purge was published by any of those proposed to be purged, or by their families, to the Board of Registrars.

In May 1966, there were 3,023 Negroes registered and 2,823 whites registered, making a total registration of 5,846 (Defendants' Exhibits 3 and 14). This is a 51.7% Negro and 48.2% white registration of the total registration. The purge list consisting of 11 Negroes out of 29 voters is a 37.9% Negro against 59.9% white. No inference arises on a percentage basis. This is a very small number to be purged out of the total registration. In view of the excess white voter registration over the white census population, together with the defendants' explanation of the excess white registration due to the maintenance of domicile in Bullock County, the purging of Negroes who have left the county temporarily or longer is suspicious and subject to the closest of scrutiny and extraordinary steps should be taken to assure absolute equality in the purging of voters regardless of race.

■ The court views the evidence as insufficient to set aside the election in Bullock County and in the Place No. 2, House of Representatives, District 31, comprising Macon, Bullock and Barbour Counties and to have the court set a date for a new run-off election.

Certain relief is granted in Bullock and Macon Counties (1) with reference to the Board of Registrars purging the registration lists, and (4) that portion of relief which seeks "in all future elections the election officials refrain from in any way inhibiting Negro voters from the free exercise of their right to vote."

## CONCLUSION

To properly view this case, the court thinks a summary of the existing conditions at the time of the election should be made. The three counties, Macon, Bullock, and Barbour, have heavy Negro populations. Macon and Bullock have more adult Negroes (1960 census) than whites. Since Reconstruction days there were no elected Negro office holders in these counties until the early 1960's. In September 1961, Judge Frank M. Johnson, Jr., in a case arising in Bullock County, United States v. State of Alabama and Julius Paschal Thompkins, et al., Civil Action No. 1677-N, United States District Court for the Middle District of Alabama, made a finding that there were five registered Negro voters in Bullock County. Since that time, and particularly since the 1965 Voting Rights Act, there has been massive Negro registration. In Bullock County, 3,023 Negroes were on the voter registration lists in May 1966. Negroes constitute approximately 70% of the total population of Bullock County and until recently have had no electoral voice in their government. Their enfranchisement has come about principally by pressure of national legislation and orders of the federal courts. Upon the failure of any Negro to be nominated in the May 31, 1966 Primary (whereas in adjoining Macon County several Negro candidates were nominated), and the disagreements which arose on election day at the polls which did not arise in the adjoining counties of Macon and Barbour, it is easily understandable that the plaintiffs' suspicions might have become aroused, multiplied, and magnified.

As for the defendants and the white population of Bullock County, the transition from dominant political control of their elected officials to the prospect of sharing or losing this control to the Negro population, with a great number of those registered being illiterate and untrained, was undoubtedly a searing emotional experience.

The Negroes were haunted by slavery and historical discrimination, and the white population was haunted by 19th Century Reconstruction politics.

In the progress of this case from the initial stages where heavy emphasis was on gross absentee ballot violations involving *deceased* persons and other illegal voters, *gross refusal* to give Negro voters *assistance* at the polls or to allow them to cast *challenged* votes, *gross registration* of out of county people, including an improper May 16, 1966 registration, and a conspiratorial design to dilute the Negro vote, depriving the Negroes of their constitutional and statutory rights, to the final submission of this cause, the thrust has changed (which is not uncommon in the progress of a law suit) to a series of circumstances suspicious in nature due to the background and context of this case.

This action was filed approximately one month after the primary. Trial on the merits was not had until approximately eleven months later. There was a hiatus in the taking of evidence of more than one and one-half months, and when the defendants rested, the court granted an opportunity to the plaintiffs of almost three additional months for further investigation.

All three counties are rural and the principal investigation centered in Bullock County. Elaborate, extensive, and intensive discovery was requested and in almost every instance fully granted. Teams headed by counsel for the plaintiffs and of the United States Department of Justice, including the FBI, were used to investigate various charges made in the complaint. The total population of Bullock County, according to the 1960 census, was 6,837 and was probably about the same in 1966. The evidence in this case indicates that the total voter

registration was 2,823 white and 3,023 Negro. Because of the small size of Bullock County, an investigation of this magnitude was simple as compared to what an investigation would have involved in a modest sized town. Even so, it was complex and, as the court has seen in the course of this trial, it was easy to become lost in minutia.

The court finds that in most instances of discovery, when the court made its position clearly known to the defendants, cooperation was had without undue recalcitrance or obstructionism. The defendants attorneys agreed, consented, and reasonably cooperated in an honorable manner.

The court cannot escape the conclusion that had there been any significant fraud, racially orientated, or any significant racial discrimination, it would have been exposed.

During the pretrial and trial of this case a "feel" of the case developed. The allegations in the complaint and the charges by the plaintiffs were alarming in that they alleged widespread and fraudulent discriminatory practices. There were strong charges of unfair and obstructionist practices in the investigation of the case (see plaintiffs' motion for contempt).

As the conferences, pretrial hearings and trial on the merits progressed, there was a definite shift in plaintiffs' emphasis as the evidence developed far short of the original allegations.

The posture of the case at the time of submission represented principally, (1) strong disagreement between the plaintiff and the defendants as to whether or not poll watchers had the right to have lists of voters, or memoranda of lists, at the polls, (2) the number of poll watchers the Negro candidates were entitled to have at each machine or ballot box at a voting place, and (3) plaintiffs' attempt to have the election set aside and a new primary date set. Neither of the first two propositions have been answered by the Appellate Courts of Alabama. The various interpretations placed on the Alabama law with reference to the first two propositions by the plaintiffs and defendants are not far-fetched nor arbitrarily unreasonable, but represent on each side sound differences on legal questions.

The third contention principally involves the claim of excess white registration over white population in Bullock County. Based on the estimate of the plaintiffs' demographic expert of the white population, there would be approximately 428 excess white voters.

Residence, as determined by the demographic expert, and the right to vote as determined by domicile under the Alabama law, are not necessarily the same.

The court has found that the plaintiffs' evidence is insufficient to show racial discrimination as alleged in the complaint with reference to these voters. However, the court purposely does not make a finding that all of these people should be on the registered rolls in order that under the decree of this court the Board of Registrars may, and should, freely purge if it is found any of these persons should be purged.

The court has refrained from attempting to count votes for either candidate, or to disallow certain votes cast, but has viewed the votes cast in the light of whether or not there has been racial discrimination alleged to be in violation of the Fourteenth and Fifteenth Amendments to the Constitution and the statutory enactments. As pointed out earlier, this suit is not an election contest and the court is not concerned in determining the relief to be granted with whether or not the plaintiffs or defendants could demonstrate that the outcome would have been different had certain acts not occurred. The court's job is to determine if there were certain discriminatory practices followed which apart from demonstrated injury or the inability to do so, so infected the processes of the law in this election as to require them to be stricken down as invalid. Cf. Hamer v. Campbell, 358 F.2d 215 (5th Cir. 1966), cert. den. 385 U.S.

851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); Bell et al. v. Southwell et al., 376 F.2d 659 (5 Cir. 1967).

The manner in which the Bullock County Board of Registrars and Probate Judge handled the purging of the Voter Registration List should be, and is being, corrected by this decree. The court finds the manner in which these things were handled gives rise to suspicion and distrust although grounded on longstanding practices commenced prior to this election.

The remaining question to be disposed of in this case is what appears to the court a possible inference that since all the elected officials are white, all of those in charge of voter registration are white, and most of the election officials were white (although there were one or more Negro election officials appointed at all ballot boxes and machines, and served except one who did not report at Beat 11) there existed a conspiracy to minimize the Negro vote and maximize the white vote. It therefore follows, it is argued, that the various irregularities and disagreements which arose between Negroes and whites constituted racial discrimination. The conditions which have existed in Bullock County for years certainly provide fertile ground for suspicions but an inference is unjustified under the evidence in this case. There was a real effort to conduct a fair election without racial discrimination on May 31. The fact disagreements arose only proves everyone involved was a human being with human frailties.

The court rejects a concept that in a pluralistic society such as America persons of different races, or for that matter, different creeds, are unable or unwilling to deal justly and fairly with members of other races or other creeds. Such a view fails to understand the basic concept and loyalties of people of all races and creeds in our pluralistic society. It fails to believe persons of different races and different creeds can, and more often than not, do deal fairly with each other under the law.

This law suit probably could have been avoided, and similar law suits in the future can be avoided, if the defendants and all officials who occupy similar positions will take pains not only to observe the legal requirements with reference to racial discrimination, but also to avoid participating in and creating (and offer leadership to the electorate to avoid) situations which easily and quite naturally arouse suspicion of racial discrimination.

An example of such suspicious circumstances is the charge that when Negro voters leave the county notice is immediately given of their prospective purge, yet there are on the registration rolls 428 white voters physically absent from the county. The same consideration for retaining voter registration in the home of origin for the Negroes should be granted as that granted to the white voter.

For another example, where meetings take place prior to an election for a discussion (and such communication should be encouraged) of respective plans with reference to activity on election day of poll watchers, duties of poll officials, etc., great care should be taken among all parties in determining what the poll watchers, etc. plan to do and what the poll officials expect. Last minute changes of what is to be done and what is expected creates mutual suspicion and distrust. It is recognized that many people of varying motivation and emotional makeup are involved among all interested groups and the leadership of no group can vouch in minute detail for what will happen on election day, but *leaders should lead* and make their influence felt among their respective groups as much as possible.

It may be from fear that white voted for white and Negro for Negro, but if. we would make a reality of the American dream, we should vote for a man on his merit regardless of color, race, or creed. This will include whites voting for meritorious Negroes as well as Negroes voting for meritorious whites.

However, in our system we are free to vote with or without reasons, including a vote based on fear growing out of a troubled past, as well as a vote in a faith founded on a hope of a better and greater America free from such fears.

In the court's judgment, this was a free election, polarized as it was by white and Negro alike. The progress made in these three counties within recent years can be viewed with high heart. All is not perfect, but having reached this level it is believed that these defendants and their successors can now look higher still, having seen this much progress, only to see that greater progress can be achieved and only seeing this opportunity, to achieve it.

### DECREE

This court concludes that in order to minimize friction and misunderstanding between the races, and to attempt to reduce suspicions of discriminatory practices by the defendants, it is necessary to enter the following order. It is therefore the order, judgment, and decree of this court that the Board of Registrars of Macon County, Alabama, together with their agents, officers, successors, and all of those acting in concert or participation with them be, and the same are hereby enjoined from failing to act as herein set out which is in accordance with an agreement between the plaintiffs and said defendants as set out in the Appendix and it is incorporated herein as if set out *in haec verba*.

It is the further order, judgment, and decree of the court that the defendants, Fred D. Main, etc., the Board of Registrars for Bullock County, Alabama, together with their agents, officers, successors, and all those acting in concert or participation with them, be and the same are hereby enjoined from failing to follow the procedures hereinafter set out with reference to the purging of voters and the changing of beat assignments of voters:

(1) The Board of Registrars is to maintain

(a) A book styled Notice to Purge, and the names of all persons proposed to be purged are to be entered in this book whether they are purged or not, and the notice to purge is to be published in the newspaper as required by Alabama law;

(b) A book entitled Purge Book, and in this book is to be entered the names of those who are purged after the completion of the process as required by Alabama law; and

(c) A Precinct Book which includes the names of all registered voters, and whenever a name is entered in the book hereinabove styled "Purge Book" as referred to above (b), that name is to be struck through in the "Precinct Book" herein styled in (c). The names entered in the "Purge Book" herein set out in (b), are to tally with the names struck through in the "Precinct Book" herein set out in (c).

(2) The Board of Registrars is to immediately complete the initiation of the above procedure, and at the earliest time thereafter, as provided by Alabama law, is to furnish in writing a Voter Registration List to the Probate Judge, and thereafter all newly registered voters are to be furnished the Probate Judge in writing. The Board of Registrars is to retain written copies of each list furnished to the Probate Judge together with the date of delivery to said judge. The Probate Judge is *not* to add any name to the Voter Registration List in his care and custody except it be submitted as herein described.

(3) (a) The Probate Judge is not to change the beat assignment of any registered voter except upon a written direction in accordance with the name and change as provided in writing by the Board of Registrars.

(b) The Board of Registrars is to retain a copy of the written change with the date of the delivery of said change to the Probate Judge.

It is further the order, judgment, and decree of the court that the defendants, Fred D. Main, Probate Judge, together with his agents, officers, successors, and

all those acting in concert or participation with him, be and they are enjoined from failing to do the following:

In all elections hereafter the election officials are to be instructed:

(1) That the rest room facilities at Beat 3 are NOT to be closed completely, and that whatever use is permitted, is to be available to all persons without regard to race or color; and

(2) Poll watchers are to be permitted the use of writing materials, i. e., pen, pencil, paper, etc., without restraint; and

(3) (a) The election officials at voting machines are to follow Title 17, Section 107, Code of Alabama 1940, without discrimination as to race which states that an illiterate voter " * * * may request assistance of two inspectors of his choice or some other person of his choice who has not previously so acted for any other person during the election * * *."

(b) Where paper ballots are used the election officials are to follow Title 17, Section 176, Code of Alabama 1940, without discrimination as to race which provides that a person unable to prepare his ballot because of inability to write the English language "may have the assistance of any person he may select."

It is the further order, judgment, and decree of this court that all other relief requested by the plaintiffs be and the same is hereby denied. Costs in this matter are to be taxed equally, one half against the plaintiffs and one half against the defendants for which execution may issue.

## APPENDIX

## DEVELOPMENT OF THE EVIDENCE

*Bill of Complaint and pretrial order dated January 25, 1967, requiring plaintiffs to furnish certain information.*

The following averments were made in the indicated paragraphs of the complaint, to wit, B., C., etc., and the action agreed to be taken in connection thereto at the designated place in the January 25, 1967 pretrial order, to wit (1), (a), etc.

Paragraphs B. and C. of the Bill of Complaint *allege an excess of white voter registration* over white population by "at least 918 names."

H. re "failure to purge."

K. re "votes of Negroes had been discouraged or discounted and the votes of white persons had been illegally received or encouraged in order to continue the dominance of the white political communities." In paragraph 2(a) of this *court's pretrial order* plaintiffs agreed to furnish "a list of the names" of all the *deceased* persons claimed to have been *voted* or whose names *appeared on the poll lists.* No such list was furnished. *At the trial* the evidence established that a few persons, *less than a dozen,* who were *deceased,* had not been purged. There is no evidence that any of these names were voted. Several had died shortly prior to the election.

W. —it is alleged "numerous *registered Negro* electors did *not appear upon the official poll list* * * * (and) numerous registered Negro electors were *refused permission* to cast regular ballots * * * to cast *challenged* ballots * * * such ballots were *not counted."* The *pretrial order* 2(b) provided that a list of all qualified voters whose names were omitted from the poll lists, and 2 (d), that a list of names of illiterate persons who were not given or allowed assistance at the various polling places were to be furnished. See Plaintiffs' List A. In spite of noncompliance with the pretrial order, at the trial plaintiffs were allowed to introduce Exhibit No. 22 and Plaintiffs' List of 25 Persons in connection with the allegations of paragraph W.

X. re "permitted non-resident white voters from out of * * * counties and out of state (to vote)." The *pretrial* order provided in 2(c) that plaintiff was to furnish "a list of the names of persons on the poll list who plaintiffs con-

tend no longer resided in these counties," and (e) a list of the names of non-residents of those counties who were permitted to vote. The only list furnished was one prepared by the U. S. See Government List A.

P. —in connection with the allegations in this paragraph, the *pretrial order* 2(f) provided that the plaintiff was to furnish a "list of names of absentee voters which plaintiffs allege was fraudulent." No list was furnished.

In an effort to fully explore all discovery, regardless of noncompliance with the pretrial order, evidence was permitted during the trial on the merits on all of these questions when offered.

## Re REQUIREMENTS OF PRETRIAL ORDER DATED JANUARY 25, 1967

In response to the pretrial order several exhibits were offered:

1. Plaintiffs' List A.

2. Plaintiffs' List D.

On the trial, regardless of noncompliance with the pretrial order, evidence was permitted as follows:

1. Plaintiffs' witness Fleher's testimony re eight people voting not on poll list, and

2. The same witness testified re 25 names improperly omitted from the poll lists.

3. Plaintiffs offered a list of 181 names which were obtained from reworking Government's List A and List B.

4. Plaintiffs' Exhibit No. 22 is a rework of plaintiffs' List A offered in response to pretrial order.

Plaintiffs did not furnish a list or evidence of names of illiterate voters claimed to have been denied assistance.

The U. S. responded to pretrial order and furnished:

List A re claim of names improperly carried on the poll lists.

List B of persons who should have been purged.

## PLAINTIFFS' PRETRIAL LIST A OFFERED AS DEFENDANTS' EXHIBIT NO. 17

The plaintiffs contend the 214 Negroes on this List A were omitted from the poll lists.

The court finds *12* of these were not registered and *properly omitted; 16* were *purged* due to death and *8 purged* for other reasons, totaling 36.

177 of this list, in fact, appeared on the poll lists and of these 149 voted. Only 1 name was erroneously *omitted.* 213 out of the 214 are accounted for satisfactorily.

## EVIDENCE ON TRIAL RE PLAINTIFFS' 8 WHITE PERSONS WHO VOTED AND CLAIMED WERE NOT ON POLL LIST

The court finds it was established that all of these people's names were, *in fact, on the poll list.*

## LIST D

This list contains 147 names of voters in Bullock County, Alabama, in whose names absentee ballots were cast and which plaintiffs intend to challenge at trial.

Plaintiffs gave notice that the said list of names was still under investigation and was subject to addition and deletion thereafter and before trial.

(The names are not set out herein since there was no evidence offered at the trial to support the plaintiffs' contention of fraudulent voting with reference to them, save and except the irregularities noted in the decree with reference to the notarization of the doctor's signature.)

## PLAINTIFFS' EVIDENCE AT TRIAL ABOUT 25 NEGROES IMPROPERLY OMITTED FROM POLL LISTS

Plaintiffs' evidence contended 25 names were improperly omitted from the poll list. It was established:

*10* of these, in fact, were on the poll list and voted.

*6* of these never registered.

*4* of these were purged due to death and *1* for non-residence.

*4* were not on the list but *2* were permitted to cast challenged votes.

The contention with reference to the omission of these names and List A must fall for insufficient evidence. There must be some room for human error without necessarily implying racial discrimination. Out of the massive number of Negroes registered (since 1964) the margin of possible error is remarkably small.

## PLAINTIFFS' EXHIBIT NO. 22

Plaintiffs' Exhibit No. 22 introduced at trial re 141 Negro beat assignments changed in the Bullock County Probate Judge's office. This list used as a starting basis Government's List A of 214 Negroes contended to be omitted from the poll list and reworked by the plaintiffs with the contention being changed from omission to a transfer from one beat to another improperly by the Probate Judge.

The evidence developed at the trial established that the Probate Judge made these transfers in an effort to get the Negroes beat assignment in the same beat in which they resided.

No evidence was offered to show that the changed assignment was incorrect nor that any Negro failed to vote by reason of the change.

There is a question of whether or not the Probate Judge had the authority to make the change or if the change should have been made by the Board of Registrars. The decree in this case will spell out the manner in which this is to be handled in the future.

## ASSISTANCE FOR ILLITERATE VOTERS

The plaintiffs did not furnish a list of illiterate voters whom they contended were denied assistance at the polls as required by the pretrial agreement and order. Regardless of plaintiffs' noncompliance with the pretrial order, the court permitted the plaintiffs to offer evidence during the trial which indicated scattered disagreements as to who should assist the illiterate voter. During the course of the day a practice evolved which was mutually satisfactory. The evidence was without contradiction that no Negro illiterate voter was refused assistance. The disagreement arose as to who should render the assistance. Title 17, Section 107, Code of Alabama 1940, states that where machines are in use a voter " * * * may request assistance of two inspectors of his choice or some other person of his own choice who has not previously so acted for any other person during the election * *."

Title 17, Section 176, Code of Alabama 1940, provides that a person unable to prepare his ballot (apparently paper ballot) because of inability to write the English language "may have the assistance of any person he may select."

The evidence is uncertain and unclear as to whether or not the few disagreements which arose involved machines or paper ballots or whether or not the voter's choice was someone who had previously acted for some other person during the election.

The disagreements were so small in number, and so uncertain in character, that the court finds the evidence is insufficient to establish a burdensome discriminatory practice.

The evidence in the case is readily distinguishable on its facts from United States v. Louisiana, 265 F.Supp. 703 (E.D.La.1966) which declared unconstitutional a state statute purporting to prohibit any person from giving assistance to illiterate voters.

## GOVERNMENT LIST A

This list consists of 54 names prepared for the use of IBM machine and in programming "Mr.", "Mrs.", or "Jr." were not designated. It is contended

all of these were improperly carried on the poll lists.

The court finds as follows:

30 of these were white and 23 Negro (1 is unaccounted for). 12 white and 1 Negro names listed in this exhibit were not, in fact, on the poll list. 3 white and 6 Negroes on the list *died* after the May 31st election. 10 white and 12 Negroes were properly on the poll list. (5 white and 4 Negroes *should have been* *purged* and *have now* been. None of these voted.

### GOVERNMENT LIST B.

Names of 4 persons whom the government contends should be purged. It is admitted 1 *should be* purged. Only 1 of the four voted and the court is satisfied he was *properly on* the poll list.

The evidence *on the other two* is uncertain and unsatisfactory.

## STIPULATION ACKNOWLEDGED BY PLAINTIFFS AND MACON COUNTY BOARD OF REGISTRARS IN OPEN COURT.

### IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

FRED D. GRAY, ET ALS.,
 Plaintiffs

v.

FRED D. MAIN, ET AL.,
 Defendants,

UNITED STATES OF AMERICA,
 Amicus Curiae.

CIVIL ACTION
No. 2430–N

---

It is agreed and stipulated by and between the plaintiffs and the defendant Board of Registrars of Macon County, Alabama, hereinafter sometimes called the Registrars, by and through their respective attorneys of record, as follows:

1. That the official voting list of qualified voters of Macon County as prepared and published by the Judge of Probate of Macon County, Alabama, for the primary elections of 1966 contained a number of names of persons thereon who are in law and fact not legally qualified voters of Macon County, Alabama, and should be removed from any voting lists containing their names.

2. That the Board of Registrars submitted a list of purgees to the Judge of Probate of Macon County, Alabama, in January of 1966, and that the names thereon, as well as other persons purged prior thereto by the Registrars, were not removed from the aforesaid official voting list through no fault, act or omission of the Registrars.

3. That in order to correct the list of qualified voters in Macon County and create a current valid list of such voters, it is agreed that the Court may enter substantially the following order or decree, to wit:

### "DECREE"

"Under the evidence heard by the Court and the stipulation of the plaintiffs and the defendant, Macon County Board of Registrars, the Court is of the opinion and finds that the official list of qualified voters of Macon County, Alabama, as prepared and published by the Judge of Probate of Macon County for use in the 1966 primary elections contained numerous names of persons who are not legally qualified voters, and that a current valid list of voters should be prepared by the Registrars for official

use by said Judge of Probate. Therefore, to accomplish such, it is hereby

"Ordered, adjudged and decreed as follows:

"1. That the Registrars shall forthwith begin a review of the latest 1966 list of qualified voters of Macon County (hereinafter called "the Voting List") by seeking to obtain current information from each person on said list and through the use of a 'Voter Address Report' in the form set forth and attached as Exhibit 'A' to this decree.

"2. That such Voter Address Report form, hereinafter called 'the Form,' be distributed to the persons named on said voting list by such methods as they deem appropriate and expeditious, including the aid of any responsible civic group or organization, or any responsible person suggested by the plaintiffs and who will volunteer their services for such distribution; and that the Registrars give publicity, as a public service, by articles and announcements in the newspapers and over the radio stations in Macon County, Alabama, as to such voting list correction; and that with approval of the Macon County Board of Revenue the Registrars advertise its purpose to prepare a valid current list of qualified voters, showing in such advertisement the Voter Address Report form, Exhibit 'A' hereto; that notices of the need for filing such form with the Registrars be posted on the County Courthouse Bulletin Board, in the office of the Board of Registrars and at each voting place in the County.

"3. That the following procedures shall be followed by the Registrars in compiling a valid current list of qualified voters as hereinafter ordered, to-wit:

a. A file will be set up showing, insofar as possible, all persons registered from 1902 to date.

b. A file will be set up showing, insofar as possible, all persons stricken from 1904 to date.

c. These files will be compared to determine names of all persons of whom there is a record of registration in the County and who have not been stricken.

d. All persons who turn in voter Address Report forms but of whom there is no record of registration will be notified and given an opportunity to produce proof of registration.

e. All persons who file such forms but fail to give complete information will be mailed a notice as to the information which they need to supply, and, if they still fail to respond, will then be mailed a request to appear before the Registrars so that they may be assisted in giving or obtaining complete information required by the forms.

f. After November 1, 1967, a notice shall be published in the Tuskegee News containing the names of all persons appearing on the 1966 list of qualified voters, who have failed to file such forms, or for whom there is no record of registration in the County; such notice to be a legal notice of intent to show cause why their names should not be stricken from the list of registered voters. A date for hearing, to be held not less than 30 nor more than 35 days after such notice, shall be set. Copies of such notice shall be posted at each polling place in the County, at one other location in each precinct or voting district, as the Registrar's office, and on the Courthouse Bulletin Board.

g. That in all respects the consideration of the legal right of persons to vote in Macon County shall be handled according to the laws of Alabama and that any person removed from the list of registered voters, if his whereabouts is known, shall be informed of this right to appeal any decision of the Registrars to the Circuit Court of Macon County.

h. That, following the completion of the work herein set out, and the determination of a valid list of the registered voters of Macon County, the Registrars shall prepare in triplicate a copy showing the names of all registered voters as of the date of preparation, showing the full name, date of birth, race, sex, and precinct placement for voting, and it

shall contain a signed statement to the effect that such list does contain the names of all persons on the registration list of the County, all other names having been duly and properly purged. One copy thereof to be filed with the Judge of Probate, one copy to be filed with this Court, and one copy to be retained in the office of the Registrars.

i. Such list shall henceforth be the list of registered voters of the County and no names shall henceforth be added to the list of registered voters except by registration.

j. All Voter Address Forms shall be retained for a period of one year after the completed valid list is filed as herein set out, and the list filed shall be retained as a public record by the Judge of Probate and the Registrars.

k. The plaintiffs shall have the right to inspect the records of the Registrars under the same conditions as public records are open to inspection, except that this shall not include inspection of registration applications for a period of one year from date.

l. That a list of all persons who are deleted or purged in accordance with this decree shall be prepared and furnished to this Court and another copy to the plaintiffs, showing the names, race, date of birth, sex and precinct."