CARRINGTON *v.* RASH ET AL.

No. 82.  Argued January 28, 1965.—Decided March 1, 1965.

*Wayne Windle* argued the cause for petitioner.  With him on the briefs was *W. C. Peticolas.*

*Hawthorne Phillips,* First Assistant Attorney General of Texas, and *Mary K. Wall,* Assistant Attorney General, argued the cause for respondents.  With them on the brief was *Waggoner Carr,* Attorney General of Texas.

MR. JUSTICE STEWART delivered the opinion of the Court.

A provision of the Texas Constitution prohibits "[a]ny member of the Armed Forces of the United States" who moves his home to Texas during the course of his military duty from ever voting in any election in that State "so long as he or she is a member of the Armed Forces." [1]

---

[1] Texas Constitution, Art. VI, § 2:

"Any member of the Armed Forces of the United States or component branches thereof, or in the military service of the United States, may vote only in the county in which he or she resided at the time

90

The question presented is whether this provision, as construed by the Supreme Court of Texas in the present case,[2] deprives the petitioner of a right secured by the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court of Texas decided that it does not and refused to issue a writ of mandamus ordering petitioner's local election officials to permit him to vote, two Justices dissenting. 378 S. W. 2d 304. We granted certiorari, 379 U. S. 812.

The petitioner, a sergeant in the United States Army, entered the service from Alabama in 1946 at the age of 18.

of entering such service so long as he or she is a member of the Armed Forces."

The constitutional provision has been implemented by Article 5.02 of the Election Code of Texas which provides, in part:

"Notwithstanding any other provision of this section, any member of the Armed Forces of the United States or component branches thereof who is on active duty in the military service of the United States may vote only in the county in which he or she resided at the time of entering such service so long as he or she is a member of the Armed Forces. This restriction applies only to members of the Armed Forces who are on active duty, and the phrase 'time of entering such service' means the time of commencing the current active duty. A re-enlistment after a temporary separation from service upon termination of a prior enlistment shall not be construed to be the commencement of a new period of service, and in such case the county in which the person resided at the time of commencing active service under the prior enlistment shall be construed to be the county of residence at the time of entering service."

In *Mabry* v. *Davis*, 232 F. Supp. 930 (D. C. W. D. Texas 1964), a three-judge court recently declared this same provision unconstitutional as violating the Equal Protection Clause of the Fourteenth Amendment.

[2] "The self-evident purpose of the amendment to the Constitution was to prevent a person entering military service as a resident citizen of a county in Texas from acquiring a different voting residence in Texas during the period of his military service, *and to prevent a person entering military service as a resident citizen of another state from acquiring a voting residence in Texas during the period of military service.*" 378 S. W. 2d 304, 305. (Emphasis supplied.)

The State concedes that he has been domiciled in Texas since 1962, and that he intends to make his home there permanently. He has purchased a house in El Paso where he lives with his wife and two children. He is also the proprietor of a small business there. The petitioner's post of military duty is not in Texas, but at White Sands, New Mexico. He regularly commutes from his home in El Paso to his Army job at White Sands. He pays property taxes in Texas and has his automobile registered there. But for his uniform, the State concedes that the petitioner would be eligible to vote in El Paso County, Texas.

Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot. *Pope* v. *Williams,* 193 U. S. 621. There can be no doubt either of the historic function of the States to establish, on a nondiscriminatory basis, and in accordance with the Constitution, other qualifications for the exercise of the franchise. Indeed, "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter* v. *Northampton Election Bd.,* 360 U. S. 45, 50. Compare *United States* v. *Classic,* 313 U. S. 299; *Ex parte Yarbrough,* 110 U. S. 651. "In other words, the privilege to vote in a State is within the jurisdiction of the State itself, to be exercised as the State may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals in violation of the Federal Constitution." *Pope* v. *Williams, supra,* at 632.

This Texas constitutional provision, however, is unique.[3] Texas has said that no serviceman may ever

---

[3] While many States have rules which prescribe special tests for qualifying military personnel for the vote, none goes so far as com-

acquire a voting residence in the State so long as he remains in service. It is true that the State has treated all members of the military with an equal hand. And mere classification, as this Court has often said, does not of itself deprive a group of equal protection. *Williamson*

pletely to foreclose from the franchise all servicemen who were nonresidents before induction.

One other State, Nevada, has a provision which on its face seems as prohibitory as Art. VI, § 2, of the Texas Constitution. The Nevada Constitution provides that:

"The right of suffrage shall be enjoyed by all persons, otherwise entitled to the same, who may be in the military or naval service of the United States; *provided, the votes so cast shall be made to apply to the county and township of which said voters were bona fide residents at the time of their entry into such service . . . ."* Nev. Const., Art. 2, § 3. (Emphasis supplied.)

But the Attorney General of Nevada has recently interpreted this provision to mean that servicemen such as petitioner can establish a voting residence in the State if they show their intent to remain by "clear and unequivocal evidence." Op. Atty. Gen. Nev. 194, 197 (1961-1962).

Under the Federal Voting Assistance Act of 1955, 69 Stat. 584, the Department of Defense collects and distributes to military personnel an analysis of state voter qualifications as applied to servicemen. The 1964 report states:

"For voting purposes the legal residence of members of the Armed Forces is generally the State from which they entered military service. This home State remains as the only State in which a person in the Armed Forces has the legal right to vote unless certain conditions are met. Almost all States except Texas will permit persons in the Armed Forces to acquire a new voting residence within their jurisdiction. When this is accomplished, voting rights in the old State of residence are lost." Voting Information 1964, Department of Defense, p. x.

Constitutional and statutory provisions of other States which treat the military specially, do not absolutely prohibit any opportunity to prove residence. The Georgia Constitution, for example, provides that no member of the Armed Forces "shall acquire the rights of an elector by reason of being stationed on duty in this State." Georgia Const., § 2-702; see Indiana Const., Art. 2, § 3; Oregon Const., Art.

v. *Lee Optical Co.*, 348 U. S. 483. But the fact that a State is dealing with a distinct class and treats the members of that class equally does not end the judicial inquiry. "The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose. . . ." *McLaughlin* v. *Florida,* 379 U. S. 184, 191.

It is argued that this absolute denial of the vote to servicemen like the petitioner fulfills two purposes. First, the State says it has a legitimate interest in immunizing its elections from the concentrated balloting of military personnel, whose collective voice may overwhelm a small local civilian community. Secondly, the State says it has a valid interest in protecting the franchise from infiltration by transients, and it can reasonably assume that those servicemen who fall within the constitutional exclusion will be within the State for only a short period of time.

The theory underlying the State's first contention is that the Texas constitutional provision is necessary to prevent the danger of a "takeover" of the civilian community resulting from concentrated voting by large numbers of military personnel in bases placed near Texas towns and cities. A base commander, Texas suggests, who opposes local police administration or teaching policies in local schools, might influence his men to vote in conformity with his predilections. Local bond issues may fail, and property taxes stagnate at low levels because military personnel are unwilling to invest in the future of the area. We stress—and this a theme to be reiterated—that Texas has the right to require that all mili-

---

II, § 5; Alabama Code, Tit. 17, § 17. Other States distinguish between servicemen who live on the base, and those who have acquired homes in the community. Cf. Restatement, Conflict of Laws § 21, Comment *c.*

tary personnel enrolled to vote be bona fide residents of the community. But if they are in fact residents, with the intention of making Texas their home indefinitely, they, as all other qualified residents, have a right to an equal opportunity for political representation. Cf. *Gray v. Sanders,* 372 U. S. 368. "Fencing out" from the franchise a sector of the population because of the way they may vote is constitutionally impermissible. "[T]he exercise of rights so vital to the maintenance of democratic institutions," *Schneider* v. *State,* 308 U. S. 147, 161, cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents. Yet, that is what Texas claims to have done here.

The State's second argument is that its voting ban is justified because of the transient nature of service in the Armed Forces.[4] As the Supreme Court of Texas stated: "Persons in military service are subject at all times to reassignment, and hence to a change in their actual residence . . . they do not elect to be where they are. Their reasons for being where they are . . . cannot be the same as [those of] the permanent residents." 378 S. W. 2d, at 306. The Texas Constitution provides that a United States citizen can become a qualified elector if he has "resided in this State one (1) year next preceding an election and the last six (6) months within the district or county

---

[4] The constitutional provision at issue in this case seems designed more as a rule prohibiting a serviceman from ever acquiring a voting residence than a disqualification from the franchise. Prior to 1954, Art. VI, § 1, of the Texas Constitution included among the "classes of persons . . . not . . . allowed to vote in this State": "5. All soldiers, marines and seamen employed in the service of the Army or Navy of the United States." This clause was eliminated, according to the annotator's notes, to "confer the privilege to vote upon members of the regular establishment of the Armed Forces." 9 Vernon's Texas Civ. Stat. 19 (1964 Supp.). The 1954 constitutional amendment, involved in this case, was added to the section which establishes residence qualifications for voters.

in which such person offers to vote." Article VI, § 2, Texas Constitution. It is the integrity of this qualification of residence which Texas contends is protected by the voting ban on members of the Armed Forces.

But only where military personnel are involved has Texas been unwilling to develop more precise tests to determine the bona fides of an individual claiming to have actually made his home in the State long enough to vote. The State's law reports disclose that there have been many cases where the local election officials have determined the issue of bona fide residence. These officials and the courts reviewing their actions have required a "freely exercised intention" of remaining within the State, *Harrison* v. *Chesshir,* 316 S. W. 2d 909, 915. The declarations of voters concerning their intent to reside in the State and in a particular county is often not conclusive; the election officials may look to the actual facts and circumstances. *Stratton* v. *Hall,* 90 S. W. 2d 865, 866. By statute,[5] Texas deals with particular categories of citizens who, like soldiers, present specialized problems in determining residence. Students at colleges and universities in Texas, patients in hospitals and other institutions within the State, and civilian employees of the United States Government may be as transient as military personnel. But all of them are given at least an opportunity to show the election officials that they are bona fide residents.

Indeed, Texas has been able, in other areas, to winnow successfully from the ranks of the military those whose residence in the State is bona fide. In divorce cases, for example, the residence requirement for jurisdictional purposes, like the requirement for the vote, is one year in the State and six months in the forum county. The Texas courts have held that merely being stationed within the

---

[5] 9 Vernon's Tex. Civ. Stat. (Election Code) Art. 5.08.

State may be insufficient to show residence, even though the statutory period is fulfilled. Even a declared intention to establish a residence may be not enough. "However, the fact that one is a soldier or sailor does not deprive him of the right to change his residence or domicile and acquire a new one." *Robinson* v. *Robinson,* 235 S. W. 2d 228, 230.

We deal here with matters close to the core of our constitutional system. "The right . . . to choose," *United States* v. *Classic,* 313 U. S. 299, 314, that this Court has been so zealous to protect, means, at the least, that States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State. *Oyama* v. *California,* 332 U. S. 633. By forbidding a soldier ever to controvert the presumption of nonresidence, the Texas Constitution imposes an invidious discrimination in violation of the Fourteenth Amendment. "[T]here is no indication in the Constitution that . . . occupation affords a permissible basis for distinguishing between qualified voters within the State." *Gray* v. *Sanders,* 372 U. S. 368, 380.

We recognize that special problems may be involved in determining whether servicemen have actually acquired a new domicile in a State for franchise purposes. We emphasize that Texas is free to take reasonable and adequate steps, as have other States,[6] to see that all applicants for the vote actually fulfill the requirements of bona fide residence. But this constitutional provision goes beyond such rules. "[T]he presumption here created is . . . definitely conclusive—incapable of being overcome by proof of the most positive character." *Heiner* v. *Donnan,* 285 U. S. 312, 324. All servicemen not residents of Texas before induction come within the provision's sweep. Not one of them can ever vote in Texas, no matter how

---

[6] See note 3, *supra.*

long Texas may have been his true home. "[T]he uniform of our country . . . [must not] be the badge of disfranchisement for the man or woman who wears it." [7]

*Reversed.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, dissenting.

## I.

Anyone not familiar with the provisions of the Fourteenth Amendment, the history of that Amendment, and the decisions of the Court in this constitutional area, would gather from today's opinion that it is an established constitutional tenet that state laws governing the qualifications of voters are subject to the limitations of the Equal Protection Clause. Yet any dispassionate survey of the past will reveal that the present decision is the first to so hold.

In making this holding the Court totally ignores, as it did in last Term's reapportionment cases, *Reynolds* v. *Sims,* 377 U. S. 533 (and companion cases), all the history of the Fourteenth Amendment and the course of judicial decisions which together plainly show that the Equal Protection Clause was not intended to touch state electoral matters. See my dissenting opinion in *Reynolds* v. *Sims*, at 589. If that history does not prove what I think it does, we are at least entitled to be told why. While I cannot express surprise over today's decision after the reapportionment cases, which though bound to follow I continue to believe are constitutionally indefensible, I can and do respectfully, but earnestly, record my protest

[7] Message of Governor Ellis Arnall to General Assembly of Georgia, p. 5 (January 3, 1944).

against this further extension of federal judicial power into the political affairs of the States. The reapportionment cases do not require this extension. They were concerned with methods of constituting state legislatures; this case involves state voter qualifications. The Court is quite right in not even citing them.[1]

I deplore the added impetus which this decision gives to the current tendency of judging constitutional ques-

---

[1] None of the cases on which the Court does rely lends any support to its decision.

In *Pope* v. *Williams,* 193 U. S. 621, the Court upheld a Maryland statute which required voters to have been registered in the State for at least a year. The Court said of the right to vote:

"It is not a privilege springing from citizenship of the United States. . . . It may not be refused on account of race, color or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, the privilege to vote in a State is within the jurisdiction of the State itself, to be exercised as the State may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals in violation of the Federal Constitution [obviously referring to the Fifteenth and not the Fourteenth Amendment]. . . . The question whether the conditions prescribed by the State might be regarded by others as reasonable or unreasonable is not a Federal one." 193 U. S., at 632–633.

*Lassiter* v. *Northampton Election Bd.,* 360 U. S. 45, upheld the literacy test applied in North Carolina against an attack made on its face. The Court noted that:

"Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the *Fifteenth Amendment* was designed to uproot." 360 U. S., at 53. (Emphasis added.)

*Gray* v. *Sanders,* 372 U. S. 368, struck down Georgia's county-unit system for counting votes in a party primary election for the nomination of a United States Senator. It did not deal with voter qualifications.

*United States* v. *Classic,* 313 U. S. 299, dealt with stuffing ballot boxes, and *Ex parte Yarbrough,* 110 U. S. 651, with intimidation of Negroes attempting to vote. Neither dealt with voter qualifications.

None of the other federal cases cited by the Court was concerned in any way with voting.

tions on the basis of abstract "justice" unleashed from the limiting principles that go with our constitutional system. Constitutionally principled adjudication, high in the process of which is due recognition of the just demands of federalism, leaves ample room for the protection of individual rights. A constitutional democracy which in order to cope with seeming needs of the moment is willing to temporize with its basic distribution and limitation of governmental powers will sooner or later find itself in trouble.

For reasons set forth at length in my dissent in *Reynolds,* I would dismiss the complaint in this case for failure to state a claim of federal right.

## II.

I also think this decision wrong even on the Court's premise that it is free to extend the Equal Protection Clause so as to reach state-established voter qualifications. The question here is simply whether the differentiation in voting eligibility requirements which Texas has made is founded on a rational classification. In judging this question I think that the dictates of history, even though the Court has seen fit to disregard them for the purpose of determining whether it should get into the matter at all, should cause the Court to take a hard look before striking down a traditional state policy in this area as rationally indefensible.

Essentially the Texas statute establishes a rule that servicemen from other States stationed at Texas bases are to be treated as transients for voting purposes. No one disputes that in the vast majority of cases Texas' view of things accords with fact. Although it is doubtless true that this rule may operate in some instances contrary to the actual facts, I do not think that the Federal Constitution prevents the State from ignoring that possibility in the overall picture. In my opinion Texas

could rationally conclude that such instances would likely be too minimal to justify the administrative expenditure involved in coping with the "special problems" (*ante*, p. 96) entailed in winnowing out the bona fide permanent residents from among the transient servicemen living off base and sending their children to local schools.

Beyond this, I think a legitimate distinction may be drawn between those who come voluntarily into Texas in connection with private occupations and those ordered into Texas by military authority. Residences established by the latter are subject to the doubt, not present to the same degree with the former, that when the military compulsion ends, so also may the desire to remain in Texas.

And finally, I think that Texas, given the traditional American notion that control of the military should always be kept in civilian hands, emphasized in the case of Texas by its own special historical experience,[2] could

---

[2] The 1837 election law of the Republic of Texas, § 9, provided "That regular enlisted soldiers, and volunteers for during the war, shall not be eligible to vote for civil officers." 2 Laws of Republic of Texas, p. 8, in 1 Gammel, Laws of Texas, p. 1350. "This provision was no doubt inspired by the mutinous conduct of the nonresident volunteers who had been recruited in the United States after the Battle of San Jacinto. They had defied the provisional government and on one occasion in July, 1836, had sent an officer to arrest President David G. Burnett and his cabinet to bring them to trial before the army. They had continued their rebellious conduct after Sam Houston became the first president under the Constitution of 1836. It was not until May, 1837, that Houston was able to dissolve the army and eliminate this threat to civil authority. This provision disfranchising soldiers in the regular army was placed in the 1845 Constitution of the State of Texas and has remained in each succeeding constitution. It was modified in 1932 to exempt the National Guard and reserve and retired officers and men." McCall, History of Texas Election Laws, 9 Vernon's Ann. Tex. Civ. Stat., pp. XVII–XVIII (1952).

Other States which had similar provisions in their early constitutions included Alabama, Const. of 1819, Art. III, § 5; Arkansas, Const. of 1836, Art. IV, § 2; Indiana, Const. of 1816, Art. VI, § 1; Louisiana,

rationally decide to protect state and local politics against the influences of military voting strength by, in effect, postponing the privilege of voting otherwise attaching to a service-acquired domicile until the serviceman becomes a civilian and by limiting Texan servicemen to voting in the counties of their original domicile.[3]   Such a policy on Texas' part may seem to many unduly provincial in light of modern conditions, but it cannot, in my view, be said to be unconstitutional.

Thus, whether or not this Court has subject matter jurisdiction in this case, the judgment of the Supreme Court of Texas should not be disturbed.

---

Const. of 1845, Art. 12; Missouri, Const. of 1820, Art. III, § 10; South Carolina, Const. of 1790 (as amended in 1810), Art. I, § 4; Virginia, Const. of 1830, Art. III, § 14.

The 1932 amendment to the Texas Constitution was replaced in 1954 by the present provision.

[3] Tex. Const., Art. VI, § 2, quoted in Court's opinion, *ante*, n. 1.