Janet SLOANE, on behalf of herself and
approximately 7,000 other students of
Pennsylvania State University

v.

George C. SMITH et al.

Civ. No. 72–488.

United States District Court,
M. D. Pennsylvania.

Oct. 3, 1972.

Amended Order Oct. 12, 1972.

American Civil Liberties Union, Ambrose R. Campana, Peter T. Campana, Williamsport, Pa., Marshall Lichtenstein, Washington, D. C., for plaintiff.

J. Shane Creamer, Atty. Gen., Dept. of Justice, J. Justin Blewitt, Jr., Harrisburg, Pa., for intervening plaintiffs.

John W. Blasko, State College, Pa., for defendants.

## MEMORANDUM AND ORDER

### NEALON, District Judge.

This is a class action brought on behalf of all voting age students at Pennsylvania State University who wish to register to vote in Centre County, Pennsylvania, in which an injunction is sought to restrain the Centre County Commissioners from utilizing voter registration procedures that illegally discriminate against them in violation of the 14th and 26th Amendments to the United States Constitution, and sections 1971, 1973 and 1983 of title 42, United States Code. Jurisdiction is asserted under 28 U.S.C.A. § 1343(3) and declaratory and injunctive relief is sought pursuant to 28 U.S.C.A. §§ 2201, 2202. The Commonwealth of Pennsylvania was allowed to intervene as a party plaintiff and a final hearing was held October 2, 1972, at which the following facts were established:

1. Centre County, Pennsylvania, has a population of 99,450 of which 34,192 are registered voters.

2. The Borough of State College is located in Centre County and has within its boundaries Pennsylvania State University where 27,200 students are enrolled. This student population is counted for legislation apportionment purposes and also in determining the amount of reimbursement paid by the State to the County under the liquid fuels tax.

3. There are 3,500 students registered in Centre County but not all of these are Penn State students as some are Centre County residents attending other schools both within and without the County.

4. The Centre County Commissioners under Pennsylvania law also serve as the County Board of Elections and have the responsibility of receiving and processing applications for registration as voters.

5. Prior to 1970, duly authorized registration clerks employed in the office of the County Commissioners received and processed applications for registration as voters; did not require additional documentation as proof of residence; applications were not individually reviewed as a matter of policy by the County Commissioners; and vot-

ers were registered by these clerks without obtaining clearance or approval from the County Commissioners.

6. Commencing in 1970, the County Commissioners have reviewed and either approved or rejected every registration application.

7. Commencing in 1970, in addition to the application form mandated by Pennsylvania law, which the applicant must execute under oath and which contains the claimed residence of the applicant, the Centre County Commissioners required all registration clerks and authorized volunteers [1] to utilize a separate "white sheet" in questioning applicants and on which specific and detailed information was to be placed concerning documentation of an applicant's residence. These completed "white sheets" and executed application forms were then transmitted to the County Commissioners who made the sole determination as to the eligibility of the registrant.

8. Commencing in 1970, an applicant would not be allowed to register unless he produced (a) a Pennsylvania driver's license containing a Centre County address [2] or (b) two or more, or a combination of, credit cards showing a charge account with a Centre County commercial establishment, checking or savings account with a Centre County Bank or Savings and Loan Association, lease, passport or other similar indicia of business or commercial activity within the County. A single credit card or lease or bank account was not enough and rent receipts, utility bills, University Identification Cards, Bursar's receipts or Dining Hall meal tickets were not recognized as evidence of residency. Moreover, if the applicant's driver's license showed an address other than Centre County the application was rejected except in a very few instances where there was an abundance of other documentation indicating residency in Centre County.

9. Many students at Penn State are are aware of the stringent residency requirements in Centre County and did not attempt to register because they did not want to expose themselves to this type of questioning and were convinced that they would not be allowed to register.

10. Since May, 1972, there were 3,002 registration applications filed in Centre County, including 752 students. Of the 2,250 nonstudents, 16 were rejected and of the 752 students, 74 were rejected.

11. The Centre County Commissioners do not challenge the physical presence of applicants at the address listed in the application and do not challenge the duration of their stay but, despite the applicant's residency claim under oath, insist on additional documentary proof, viz., "black and white factual proof" that each applicant actually intends to claim the Centre County address as his legal residence.

12. The Centre County Commissioners believe that the absence of a Centre County address on the applicant's driver's license or a combination of other documentation as hereinbefore identified, establishes to their satisfaction that the applicant intends to make his legal residence at some address outside of Centre County.

13. Janet S. Sloane, a Penn State student living in State College since June, 1971, was not allowed to register because she didn't have a driver's license with a Centre County address (she does not have a license because of a sight deficiency) and did not have a lease or a credit card showing her address. She appealed to the Board of County Commissioners who, in addition to asking for further proof of residency, inquired whether she thought a student should

---

1. The League of Women Voters of Centre County volunteered to assist in processing applications from Penn State students.

2. The Pennsylvania Motor Vehicle Code requires an operator to report a change of address to the Bureau of Motor Vehicles within 15 days of such change.

serve on the Borough Council. She was not allowed to register.

14. Elaine Carol Herscher, a Penn State student living in State College since 1970, produced a credit card from Penn Traffic, State College, Pa., but was not allowed to register because her driver's license contained the Montgomery County address of her parents despite her explanation that she was of the opinion that there would be a problem of insurance coverage if she changed the address and for the further reason that she drove an automobile only when she visited her parents in Montgomery County.

15. Melanie Ruth Manko, a Penn State Graduate Student living in State College since April, 1971, was not allowed to register when she couldn't produce a driver's license with a Centre County address, notwithstanding the fact that she produced (1) a checking account deposit book with Peoples National Bank, State College, Pa., showing a Centre County address; (2) a Savings Account book with the Mount Nittany Savings and Loan Association, State College, Pa., indicating a Centre County address; and (3) a Bursar's receipt from Penn State showing a Centre County address.

16. Charles Michael Scott, a Penn State graduate student living at State College since September, 1968, was not allowed to register because his only proof of residency was a lease agreement for his living quarters in State College.

17. Mary Ann Hrivnak, a Penn State student living in State College since September, 1969, submitted a Penn State Identification Card and a Dining Hall meal ticket as further proof of residency but was refused registration. She appealed to the Board of County Commissioners and at the hearing produced Bursar's receipts since 1969 and a checking account book showing a State College address. In addition, Rev. Wenzke,

a Lutheran Minister, testified that Miss Hrivnak had been an active member of the Lutheran Student Congregation at the University for three years.[3] When queried about the address on her driver's license, Miss Hrivnak informed the Commissioners that she had notified the Bureau of Motor Vehicles concerning her State College address but that her corrected license had not been received. Despite all of this information, the Commissioners refused to register her until she actually presented the corrected driver's license to them. As a result, Miss Hrivnak drove more than 100 miles to the Bureau of Motor Vehicles in Harrisburg, Pa., procured the address change on her license and, upon presenting this proof to the Commissioners, she was allowed to register.

18. Charles Frederick Smith, a Penn State student living at State College since September 1970, exhibited a lease and checking account card showing a State College address but was not allowed to register. He appealed to the Board of Commissioners and produced his present lease, his prior lease, a savings account book, a checking account card and payroll slips for summer employment, all showing a State College address. In addition, Rev. Wenzke testified as to his continued residence in State College but he was not allowed to register until he drove to Harrisburg, Pa., with Miss Hrivnak, and similarly obtained an address change on his driver's license.

19. Calvin D. Allen, a Penn State graduate student and a State College resident since September, 1969, was not allowed to register although he submitted a lease agreement for his present address with 13 more months to run. He formerly resided in Roselle, Illinois, and has an Illinois driver's license which was issued for a three-year period but considers State College to be his legal residence.

3. County Commissioner Jacob Corman, Jr. stated that if Rev. Wenzke was Pastor of a Lutheran Church in the community rather than at the University, his testimony would probably have sufficed.

20. Barbara Cross, a Penn State graduate student and a State College resident since September, 1968, was not allowed to register although she produced rent receipts, utility bills, and a checking account, all designating a State College address. Subsequently, she attempted to register again and, after displaying Wage Tax receipts for previous employment as a Penn State faculty member, she was permitted to register.

21. Sandra Gay Ewing, while a resident of State College, identified herself as a teacher in her application form and was allowed to register without furnishing any proof of residency even though, at the time, she possessed a Virginia driver's license.

22. Terry C. Waibel, while a resident of State College, listed his occupation on the application form as Television Producer and was allowed to register without furnishing any proof of residency even though, at the time, his Pennsylvania driver's license listed a Pittsburgh address.

23. All of the plaintiff witnesses regarded State College as their legal residence for voting purposes.

24. Richard F. Wheeler, a student at Penn State and the Director of the Department of Student Political Affairs testified that between 5,000 and 10,000 Penn State students would register in Centre County except for the conditions now prevailing in the Registration Office and that many felt they would not be allowed to register if they tried.

### DISCUSSION

It cannot be disputed that a State has the power to require that vot-ers be bona fide residents of the relevant political subdivisions and an appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny. Dunn v. Blumenstein, 405 U.S. 330, 343, 344, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). But the power of the State to make these inquiries must be exercised in a reasonable manner. Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). And where one group or class is required to meet a more stringent test of residency for voting purposes than another, such classification is said to be suspect and cannot be justified unless there is a compelling state interest in the imposed restriction or classification. See Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1970); Bright v. Baesler, 336 F.Supp. 527 (E.D.Ky.1971). What we have before us now, however, is an individual county, one of 67 in Pennsylvania, following a course of inquiry which both the State Attorney General and the Secretary of the Commonwealth regard as constitutionally and legally unacceptable.[4] The Centre County Commissioners purportedly base this policy on their interpretation of those provisions of the Pennsylvania Election Code concerning qualifications of voters and rules for determining residence. 25 P.S. §§ 2811, 2813, 2814. Plaintiffs contend it is predicated on the fear of a "community takeover" by the large student population at Penn State.[5]

The policy adopted in Centre County is more demanding than that pursued in at least a majority of Pennsylvania

---

4. Since this case involves a constitutional question of considerable importance which cannot be avoided by adjudication in the State courts, I conclude that the doctrine of abstention does not apply here. Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Bright v. Baesler, 336 F.Supp. 527 (E.D.Ky. 1971).

5. The alarm over student takeovers has not been borne out by statistical studies which indicate that this has not occurred in those areas where student participation has been encouraged. See Note, "Restrictions on Student Voting", 4 U.Mich.J.L. Reform 215 (1970); Note, 55 Iowa L. Rev. 616 (1970). Moreover, a "fencing out" from the franchise a segment of the population because of the way they may vote is constitutionally impermissible. Evans v. Cornman, 398 U.S. 419, 423, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), Carrington v. Rash, 380 U.S. supra at 94, 85 S.Ct. 775.

Counties if not more, as I firmly believe, than that existing in any county in the Commonwealth. The fact that Pennsylvania State University, with a student population of 27,200, is located within Centre County, with a total population, including the students, of 99,450 cannot be overlooked. Moreover, the change in procedure requiring substantial documentary proof, in addition to the applicant's statements under oath as to residency, can be traced to the year 1970, when the Federal Voting Rights Act was adopted granting franchise to 18-year olds. The Commissioners contend that the proof of residency requirements are uniform but the evidence indicates otherwise as two of plaintiff's witnesses, one a school teacher and the other a television producer, testified that after listing their occupations, they were allowed to register without furnishing additional proof as to residency. The separate "white sheet" approach was initiated in 1970 as was the Commissioners' tactic of personally approving or rejecting all registration applications. While the explanation was proferred that this change of direction was brought about because of a new policy in allowing Magistrates to obtain registration information and to assist the Commissioners in enrolling new voters, this explanation, to say the least, is suspect. Mr. Corman, Chairman of the Board of County Commissioners, conceded that there was a change of policy but testified that it was also brought about by complaints that unqualified persons working on the construction of Interstate Route 80 were attempting to register in order to avoid paying for a higher nonresident hunting license. He admitted further that there was a much higher volume of registrations attempted in the County since 18-year olds have been granted the right to vote. It doesn't take much reflection to realize that this new opportunity vastly increased the number of potential registrants at Penn State where most of the student body would fit within the 18 to 21 age bracket. Without belaboring the facts any further, it is apparent to me that the residency policy followed by the Centre County Commissioners before an applicant would be allowed to register frustrated and impaired the right to vote of students at Penn State.

The assertion of uniformity of application is flimsy and superficial as the real target was the student voters and the oral testimony as well as the registration figures disclose that in actual practice nonstudents were not subjected to the same scrutiny and proof as were students. The trend in this age of student enlightenment and involvement, as evidenced by the recent adoption of the Twenty-sixth Amendment, is to encourage youthful participation in the election process, thereby removing their voices from the streets and accommodating them in the voter's booth. The hope has been expressed that their way to the ballot box should be made clear and should not be encumbered or abridged. All of the students who testified in this case impressed the Court and appeared to be sincere and honest in their claims that they regard State College as their legal residence. If they physically live in State College, are interested in the community, are anxious to vote there and nowhere else, and intend it as their legal residence, then there is no justifiable reason why they should not be allowed to vote. Certainly they are required and expected to obey all local laws and ordinances and to submit to the governance of the duly elected local officials and it is understandable why they seek a voice in the community they regard as their own.

As stated above, unless defendants can show a compelling state interest is being served by such disparity, which obviously has not been demonstrated here, such conduct violates the equal protection clause of the Fourteenth Amendment. I conclude, therefore, that the policy followed by defendants in determining the residence of new voters was adopted as a result of their apprehension over the student vote and had the effect of discouraging and de-

priving the students at Penn State from exercising their right to vote. Furthermore, even if such policy were to be uniformly applied, it does not survive the test of reasonableness and operates as a chilling effect on First Amendment rights.

## CONCLUSIONS OF LAW

1. Jurisdiction is properly asserted in this matter under 28 U.S.C. § 1343(3) for rights established by 42 U.S.C. §§ 1971, 1973 and 1983 and the Fourteenth and Twenty-sixth Amendments of the United States Constitution.

2. The requested class consisting of all voting age students who wish to register to vote in Centre County, Pennsylvania, is a proper class under Rule 23(b)(2), Fed.R.Civ.P.

3. The requirement that members of the class meet a more stringent test of residency than other voter registration applicants is unjustifiable and violates the equal protection clause of the Fourteenth Amendment.

4. The policy change initiated by the Centre County Commissioners in 1970 of placing an additional burden of proof of domicile on new residents, which formerly was not required of old residents, is unreasonable and discriminates against the former in violation of the equal protection clause of the Fourteenth Amendment.

5. Even if the registration policy of the Centre County Commissioners were applied uniformly, it does not survive the test of reasonableness and operates as a chilling effect on First Amendment rights.

## ORDER

It appearing to the Court that the policy followed by the Centre County Commissioners in determining the residency of applicants for registration is constitutionally and legally impermissible, it is ordered that the defendants, Commissioners of Centre County, their successors, agents, employees, and all persons in active concert or participation with them are enjoined.

(a) from pursuing a policy of refusing to register any applicant who does not possess a Pennsylvania driver's license containing a Centre County address;

(b) from requiring additional documentation of residency beyond the sworn affidavit of an applicant unless defendants reasonably believe that the individual applicant's claim of residency is untrue;

(c) from discriminating against students at Pennsylvania State University by applying different standards of eligibility from those applied to other registrants; and

(d) from adopting any registration policy that discriminates, directly or indirectly, against students at Pennsylvania State University.

## AMENDED ORDER

Now, this 12th day of October, 1972, on the joint oral petition of the Intervenors and Defendants, it is ordered that the October 10, 1972, Order of this Court be amended, as follows:

It is Ordered that the Defendants, the County Commissioners of Centre County, are required to keep open the registration office at State College for a period of five working days, viz., October 11, 12, 13, 14 and 16, 1972, for the purpose of receiving applications for registration from all qualified electors.

It is further Ordered that the voter registration office at Bellefonte, Pennsylvania, remain open during regular business hours on the days required by this Court's Order of October 10, 1972, for the purpose of receiving applications for registration from all qualified electors unless on Saturday, October 14, 1972, the Commissioners in their best judgment do not deem that a full registration day is required.

Further, that the Commissioners shall be permitted to conduct such other special registration for qualified voters

**1306**

within Centre County during the period provided by this Court's Order of October 10, 1972, as the Commissioners deem the needs of the residents of Centre County require.