981 F.2d 1185
 Coy Dell ELLIS; Nancy D. Ellis; Della Ellis and Joseph T.
Ellis, Plaintiffs-Appellees,
v.
The COFFEE COUNTY BOARD OF REGISTRARS, etc., et al., Defendants,
Warren Rowe, individually and as attorney and agent for
the Coffee County Commission; and Billy Eagerton; Eugene
Bradley; Jim Dubose; Sidney Averett; Robert Stephens;
Bill Faulk, and Damascus Crittenden, individually and as
members of the Coffee County Commission, Defendants-Appellants.
 No. 91-7881.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 12, 1993.
 
 James W. Webb, Daryl L. Masters and Bart Harmon, Webb, Crumpton, McGregor, Davis & Alley, Montgomery, AL, for Billy Eagerton, et al.
 F. Chadwick Morriss, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, for Warren Rowe.
 Julian L. McPhillips, Jr., McPhillips, Hawthorne & Shinbaum, Montgomery, AL, for plaintiffs-appellees.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before BIRCH, Circuit Judge, JOHNSON, Senior Circuit Judge, and THOMAS*, Senior District Judge.
 BIRCH, Circuit Judge:
 
 
 1
 This interlocutory appeal requires our determination of whether members of a local county commission and the county attorney are entitled to immunity for their participation in deciding and communicating the voting status of a family that had moved outside the county. The district court granted summary judgment to the county commissioners in their official capacity, but denied summary judgment to them in their individual capacities as to absolute or qualified immunity. The district court also denied summary judgment to the county attorney on qualified immunity. Because the individual county commissioners and the county attorney are protected by absolute legislative immunity, we REVERSE and REMAND.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Plaintiffs-appellees Coy Dell Ellis, Nancy D. Ellis, Della Ellis, and Joseph T. Ellis owned a home in Enterprise, Alabama, located in Coffee County, and voted in that county for many years.[1] In 1982, the Ellis family moved into a house in neighboring Geneva County, where they filed, and consistently have claimed, a homestead exemption. While the new home is located in Geneva County, it is situated on land straddling the dividing line between Coffee and Geneva Counties. From 1982 to 1988, Coy and Nancy Ellis continued to vote in Coffee County.
 
 
 3
 On November 12, 1986, a consent decree, including Coffee County and providing for elections from seven, single-member districts by 1988 to remedy unlawful dilution of black voting strength, was entered in Dillard v. Crenshaw County, 640 F.Supp. 1347 (M.D.Ala.1986). The Coffee County Board of Registrars requested the assistance of the Coffee County Commission[2] in complying with the consent decree by identifying to them voters who were not qualified to vote in Coffee County. The jurisdiction of the County Commission includes designation of voting precinct boundaries.
 
 
 4
 During the period in which the commissioners were ascertaining unqualified Coffee County voters, Coy Ellis, in early 1988, publically criticized the Coffee County Commission for failing to repair a county road[3] and for paying the county attorney, defendant-appellant Warren Rowe, an alleged unjustifiably high salary. While investigating Coy Ellis's complaints concerning the subject county road, Commissioner Eugene Bradley discovered that the Ellises' home was located over the Coffee County line in Geneva County.
 
 
 5
 Resulting from the investigation into voter eligibility in Coffee County in response to the redistricting mandate of Dillard, the names of 6,000 voters who needed to verify their qualifications to vote in Coffee County were published in the local newspaper. The published list included the four Ellises. Consequently, Coy Ellis asked the chairman of the Coffee County Board of Registrars, Charles Lewis, to research the voting status of the four Ellis family members. Lewis has admitted that the Ellis case was "borderline" and a "close case."[4] He investigated the Ellises' voting status by talking with various state agencies, and a political science professor at Auburn University; the opinion of all was that the Ellises were qualified voters in Coffee County. Following considerable time and energy spent in researching the issue, Lewis concluded that the Ellises were qualified Coffee County voters.
 
 
 6
 During a document production in Ellis's mother's case against the county in June, 1988, Rowe allegedly informed Coy Ellis that the Ellises could not vote legally in Coffee County and that their attempt to do so would constitute a felony offense. Rowe also advised Lewis that the Ellises were ineligible to vote in Coffee County. On August 28, 1988, Lewis resigned from the Board of Registrars, and was succeeded by Alfred Edwards as chairman. Based on the applicable law, Edwards disagreed with his predecessor, and concluded that the Ellises, as residents of another county, could not vote in Coffee County.
 
 
 7
 Following Edwards's appointment to the Board of Registrars, County Commissioner Bradley asked Rowe to notify the Board of Registrars that the Ellises lived in Geneva County. After a meeting on September 26, 1988, the Board of Registrars by letter informed the Ellises that they were being removed from the list of qualified voters in Coffee County. The Ellises appealed this decision to the state circuit court, and the ensuing trial resulted in a hung jury.
 
 
 8
 The Coffee County Commission then ordered a survey at county expense to determine whether the Ellises lived in Coffee or Geneva County. The Ellises' second attempt to appeal the Board of Registrars' decision regarding their voting status ended in a mistrial in January, 1989.[5] The local newspaper listed the Ellises among the names of those to be purged from the Coffee County voting roster in July, 1989.
 
 
 9
 The Ellises officially were purged from the Coffee County voting list in August, 1989. In response, Coy Ellis asked several attorneys and the Auburn professor, who formerly had investigated the Ellises' voting status for the Board of Registrars, to research the issue of his legal voting residence. The result of this research, commissioned by Coy Ellis, confirmed to the Ellises that they were qualified to vote in Coffee County.
 
 
 10
 On June 5, 1990, Coy, Nancy, and Della Ellis attempted to vote challenge ballots[6] in a primary election in Coffee County. Their challenge ballots were reviewed by the Board of Registrars, forwarded to the district attorney, and their case was presented to a grand jury. In July, 1990, the Ellises were indicted for election fraud and perjury. Meanwhile, Coy Ellis pursued the civil appeal of the original order of the Board of Registrars. After two mistrials, a third trial resulted in a verdict in favor of the Ellises' contention that they were domiciled in Coffee County for voting purposes. Following the result of the civil appeal, the Circuit Court of Coffee County granted the Ellises' motion to dismiss the indictments against them on September 6, 1990.
 
 
 11
 Subsequently, the Ellises filed this action under 42 U.S.C. § 1983 in federal court for the Middle District of Alabama against the Coffee County Board of Registrars and its individual members, the Coffee County Commission and its individual members, and the County Attorney. Although the Ellises asserted many claims, the alleged constitutional deprivation relevant to this appeal is the Ellises' contention that they were denied their Fourteenth Amendment right to vote. The county commissioners and the county attorney filed a summary judgment motion asserting legislative and qualified immunity in their official and individual capacities.
 
 
 12
 In an order addressing all summary judgment motions by defendants, the district court granted summary judgment to the Coffee County Commission and its individual members in their official capacities, the Coffee County Board of Registrars, and to all parties on the charge of malicious prosecution of the Ellises. The court denied summary judgment to the Coffee County Commissioners in their individual capacities, the individual members of the Coffee County Board of Registrars, and County Attorney Warren Rowe. This interlocutory appeal concerns only the individual Coffee County Commissioners and Rowe, who contest denial of absolute legislative or qualified immunity.[7]
 
 II. DISCUSSION
 A. Jurisdiction
 
 13
 "[D]enial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); see Harris v. Deveaux, 780 F.2d 911, 913 (11th Cir.1986) ("Absolute immunity is meant to protect not only from liability, but from going to trial at all."). Accordingly, denial of a claim of absolute immunity is an immediately appealable interlocutory order. Nixon v. Fitzgerald, 457 U.S. 731, 742, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982).
 
 
 14
 Our jurisdiction analysis is limited to the narrow legal determination of whether the individual county commissioners and the county attorney are entitled to absolute immunity protection, not the merits of the section 1983 action. The Ellises contend that this court does not have immediate jurisdiction of this case because of the existence of material factual disputes which properly precluded summary judgment. The factual disputes noted by the Ellises are instances allegedly showing animus between the appellants and the Ellises and, consequently, the demonstration of a conspiracy to remove the Ellises from the voting roster in Coffee County.
 
 
 15
 "Absolute immunity does not depend on good faith or reasonableness; thus it would be unlikely to find a case where disputed factual questions precluded review." Harris, 780 F.2d at 914. Moreover, these alleged material factual disputes advanced by the Ellises are irrelevant to the legal determination of whether absolute immunity is applicable. See Rich v. Dollar, 841 F.2d 1558, 1561 (11th Cir.1988) ("[C]laims of absolute ... immunity turn on questions of law;" therefore, our review is de novo.). We conclude that this court appropriately has jurisdiction to decide the legislative immunity issue presented to us.
 
 B. The Individual County Commissioners
 
 16
 "The absolute immunity of legislators, in their legislative functions, ... now is well settled." Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982) (citations omitted); see Tower v. Glover, 467 U.S. 914, 920, 104 S.Ct. 2820, 2824, 81 L.Ed.2d 758 (1984) ("The Court has recognized absolute § 1983 immunity for legislators acting within their legislative roles...."). The Supreme Court has extended absolute immunity to state legislators, Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and to regional legislators, Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Similarly, the former Fifth Circuit found absolute immunity under section 1983 applicable to local legislators "for conduct in the furtherance of their duties." Hernandez v. City of Lafayette, 643 F.2d 1188, 1193 (5th Cir. Unit A May 1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982). This court has established that "[l]ocal legislators are entitled to legislative immunity in this Circuit." Executive 100, Inc. v. Martin County, 922 F.2d 1536, 1539 (11th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991).
 
 
 17
 Therefore, "officials seeking absolute immunity must show that such immunity is justified for the governmental function at issue." Hafer v. Melo, --- U.S. ----, ----, 112 S.Ct. 358, 363, 116 L.Ed.2d 301 (1991) (citation omitted). "[T]his court has decided that 'the absolute immunity inquiry' is determining whether the local legislators were engaging in legislative activity in the particular case under consideration." Brown v. Crawford County, 960 F.2d 1002, 1011 (11th Cir.1992) (quoting Espanola Way Corp. v. Meyerson, 690 F.2d 827, 829 (11th Cir.1982), cert. denied, 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983)). Our specific query in this case is whether the subject county commissioners were engaging in their legislative function when they participated in the removal of the Ellises' names from the voting list in Coffee County.
 
 
 18
 The "historic function" of the states has been to establish on a nondiscriminatory, constitutional basis the "qualifications for the exercise of the franchise." Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 777, 13 L.Ed.2d 675 (1965). Alabama has delegated the designation of voting precinct boundary lines to the local county commission.[8] Ala.Code § 17-5A-3(a) (Supp.1987). Accordingly, the delineation of voting precinct lines is a legislative function of Alabama county governments. See Crymes v. DeKalb County, 923 F.2d 1482, 1485 (11th Cir.1991) (per curiam) (A legislative act is characterized by having a policymaking function and general application.). Alabama law further provides that "[a]t all elections by the people of this state the elector must vote in the county and precinct of his residence and nowhere else...." Ala.Code § 17-7-13 (1975) (emphasis added). In addition to their statutory responsibility to monitor voter eligibility based on residence within a particular voting precinct, the county commissioners specifically were responding to the Dillard consent decree by identifying ineligible voters within the county.
 
 
 19
 Given these statutory guidelines and their mandate under the consent decree, the Coffee County Commissioners clearly were performing their legislative function when they investigated the voting eligibility of the listed electors on the county precinct list in order to provide the Board of Registrars with the names of those persons no longer qualified to vote in Coffee County. See McGrain v. Daugherty, 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580 (1927) ("A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information--which not infrequently is true--recourse must be had to others who do possess it."). An integral part of this process was the determination of a voter's residence. See Memory v. Brasington (In re Brasington), 10 B.R. 76, 78 (Bankr.M.D.Ala.1981) (A family can have only one homestead and the family claiming a homestead must possess "a clearly defined intention of present residence and occupancy.").
 
 
 20
 It is undisputed that the Ellises had claimed a homestead exemption in Geneva County since moving to that county in 1982. At the time that the commissioners investigated the residence of electors in 1988, the Ellises had claimed a homestead exemption in Geneva County for six years. Clearly, it was reasonable for the commissioners to list the Ellises among the 6,000 unqualified voters in Coffee County identified to the Board of Registrars to be purged from the county voting roster. Before their decision that the Ellises should be deleted from the Coffee County voting list, the commissioners voted to have a survey made of the Ellises' property to clarify any ambiguities concerning the boundaries. See Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1062 (11th Cir.1992) ("[P]reparing committee reports, and participating in committee investigations and proceedings are generally deemed legislative and, therefore, protected by the doctrine of legislative immunity." (citations omitted); DeSisto College, Inc. v. Line, 888 F.2d 755, 765 (11th Cir.1989) ("[V]oting, debate and reacting to public opinion are manifestly in furtherance of legislative duties."), cert. denied, 495 U.S. 952, 110 S.Ct. 2219, 109 L.Ed.2d 544 (1990).
 
 
 21
 Even if the Ellises could prove conspiracy or bad faith by the commissioners, an unworthy purpose does not remove absolute immunity protection from legislators acting in their legislative capacity.[9] Tenney, 341 U.S. at 377, 71 S.Ct. at 788; see Wood v. Strickland, 420 U.S. 308, 317, 95 S.Ct. 992, 998, 43 L.Ed.2d 214 (1975) (Because legislative immunity is absolute, it does "not depend upon the motivations of the legislators."). "It is precisely the historical absoluteness of legislative immunity, despite the legislators' motivations, that precludes this action against defendants-appellants in their individual or personal capacities." Brown, 960 F.2d at 1012 n. 15. This court has recognized that alleged biased remarks made by local commissioners to town residents should not be allowed to penetrate absolute legislative immunity because such a result would deter the factfinding and decisionmaking responsibility of local legislators. Healy v. Town of Pembroke Park, 831 F.2d 989, 993 (11th Cir.1987); see Bennett v. City of Slidell, 697 F.2d 657, 660 n. 8 (5th Cir.1983) (Speculation and conjecture that city council members voted to deny a liquor license until receipt of an occupancy permit because of personal bias and familial ties were insufficient to present a jury question, when the record showed that the council members were acting according to requisite procedure.), modified on other grounds en banc, 728 F.2d 762 (5th Cir.1984), cert. denied, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).
 
 
 22
 Because we find that the individual commissioners objectively were engaged in their legislative function in all of their actions relating to the Ellises' removal from the Coffee County voting list and because any subjective motivations are irrelevant to absolute legislative immunity, we conclude the individual Coffee County Commissioners are entitled to legislative immunity.[10] We specifically do not find that the Ellises were denied their constitutional right to vote; they merely were denied entitlement to vote in a county in which they did not live as decided by the county commissioners statutorily authorized to make the determination of voter eligibility based on the elector's residence. "[I]ndividual defendants have absolute immunity from any federal suit for damages if their challenged conduct furthers legislative duties." Baytree of Inverrary Realty Partners v. City of Lauderhill, 873 F.2d 1407, 1409 (11th Cir.1989) (emphasis added).
 
 C. The County Attorney
 
 23
 In conjunction with the absolute legislative immunity held by legislative bodies, the Supreme Court has extended this privilege to the chief counsel of a congressional subcommittee; committee staff, consultants, investigators, and congressional aides, insofar as they are engaged in legislative functions. Eastland v. United States Servicemen's Fund, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). The test for applicability of this derivative legislative immunity is whether the legislator, counsel or aide was engaged within a legitimate sphere of legislative activity. Eastland, 421 U.S. at 503, 95 S.Ct. at 1821; Gravel, 408 U.S. at 622, 92 S.Ct. at 2625. The Court has construed legislative acts as "an integral part of the deliberative and communicative processes" regarding the consideration and action of a legislative body for matters statutorily placed within its jurisdiction. Gravel, 408 U.S. at 625, 92 S.Ct. at 2627. Neither the motives behind the legislative activity, nor the result of the activity may be questioned by the courts. Eastland, 421 U.S. at 508-09, 95 S.Ct. at 1824; see United States v. Johnson, 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966) (Unquestionably, legislative immunity precludes inquiry into motives or purposes.).
 
 
 24
 To the extent that a legislator is cloaked with legislative immunity, an adjunct to that legislative body possesses the same immunity. See Gravel, 408 U.S. at 618, 92 S.Ct. at 2623 (Legislative immunity "applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself."). The Court has clarified that it "draw[s] no distinction between the Members [of a Subcommittee] and the Chief Counsel." Eastland, 421 U.S. at 507, 95 S.Ct. at 1823. While the legislative immunity accorded by the Supreme Court to counsel for legislative bodies has been at the national congressional level, other circuits have extended legislative immunity to attorneys representing state and local legislative bodies under derivative legislative immunity analysis. See Aitchison v. Raffiani, 708 F.2d 96, 99-100 (3d Cir.1983) (By advising the borough council on legislation, the borough attorney directly was assisting legislative activity.); Green v. DeCamp, 612 F.2d 368, 371-72 (8th Cir.1980) (By advising and assisting a state senate investigative committee, the committee counsel was entitled to legislative immunity.); cf. Bennett, 697 F.2d at 662 (Because the city attorney's action in directing that electrical service be discontinued at a lounge was at the request of the city building inspector, unknown to and unauthorized by the city council, the city attorney was not entitled to legislative immunity.).
 
 
 25
 Therefore, "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." Forrester v. White, 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988); see Yeldell, 956 F.2d at 1062 ("It is the nature of the act which determines whether legislative immunity shields the individual from suit."). In this case, Rowe, as county attorney, served as legal advisor to the Coffee County Commission. He was the commission's counsel in the Dillard case and in the implementation of the resulting consent decree implicated in this case.
 
 
 26
 The Ellises contest two incidents involving Rowe prior to the alleged wrongful act of their removal from the Coffee County voting list. The first allegedly occurred in the context of a document production in the lawsuit by Coy Ellis's mother concerning the condition of the county road on which she was injured. Although this conversation is disputed, Coy Ellis alleges that Rowe informed him that it was illegal and would be a felony for him to vote in Coffee County. Even if the statement occurred as Ellis relates it, Rowe, as attorney for the County Commission in both matters, correctly stated the position of the commission determined by investigation and research required for the commission to execute its legislative responsibility under Alabama law and the Dillard consent decree. Rowe was in a position to know the opinion of the commission because he was integrally involved in the case by advising the commissioners. Although Ellis may have taken offense at the alleged remark, we do not find that it was outside Rowe's legislative authority as legal counsel to the commission, and the statement occurred in an official context. See Tenney, 341 U.S. at 377-78, 71 S.Ct. at 788-89 (A legislative committee that allegedly "smeared" the plaintiff during an investigation was acting in a legislative investigative capacity and was entitled to absolute legislative immunity.); cf. Government of the Virgin Islands v. Lee, 775 F.2d 514, 522 (3d Cir.1985) (It is the "content" of a legislator's private conversations, not simply the occurrence of those conversations, that determines entitlement to legislative immunity.). Additionally, any of the commissioners could have made the same statement. See Tenney, 341 U.S. at 377, 71 S.Ct. at 788 ("Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good."). We conclude that Rowe was embraced by absolute legislative immunity for this remark stating the opinion of the county commission concerning the Ellises' entitlement to vote in Coffee County.
 
 
 27
 The second incident occurred during the time that numerous individuals were to be purged from the Coffee County voting list pursuant to the Dillard federal redistricting consent decree. Rowe was asked by Commissioner Bradley to convey to former Chairman Lewis of the Board of Registrars that Ellis was not entitled lawfully to vote in Coffee County. Lewis, who subsequently resigned, took no action as a result of Rowe's contact; the decision to remove the Ellises from the voting list was made by succeeding Chairman Edwards. Acting at the direction of a county commissioner charged with the legislative responsibility of determining qualified county voters, Rowe conveyed the decision of the Coffee County Commission regarding the Ellises' voting eligibility to then Chairman Lewis of the Board of Registrars. Clearly, this communication was in furtherance of the county commissioners' legislative duties, and Rowe acted as an extension of the commission. Given Rowe's function and nondiscretionary message, we conclude that he was protected by absolute legislative immunity in this communication. We further note that the efficient operation of contemporary government necessitates adjuncts performing responsibilities traditionally executed by the legislators. See Gravel, 408 U.S. at 616-17, 92 S.Ct. at 2623 ("[I]t is literally impossible, in view of the complexities of the modern legislative process, with ... matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos...."); see also Spallone, 493 U.S. at 279, 110 S.Ct. at 634 ("[F]ederal common law of legislative immunity" recognizes that "any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process.").
 
 III. CONCLUSION
 
 28
 Because we have determined that all actions relating to the removal of the Ellises from the Coffee County voting list by the individual commissioners and county attorney were in furtherance of their legislative duties, these defendants-appellants are entitled to absolute legislative immunity. Accordingly, the district court's denial of summary judgment to defendants-appellants on this basis is REVERSED and the case is REMANDED for proceedings consistent with this opinion.
 
 
 
 *
 Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 Coy Ellis and his wife Nancy have been registered voters in Coffee County since 1955 and 1963, respectively. Della and Joseph Ellis are the children of Coy and Nancy Ellis
 
 
 [2]
 At the relevant time, the Coffee County Commission was composed of the following individual members who are defendants-appellants in this case: Billy Eagerton, Eugene Bradley, Jim Dubose, Sidney Averett, Robert Stephens, Bill Faulk, and Damascus Crittenden
 
 
 [3]
 Coy Ellis's mother had been injured on the subject road, and had sued the Coffee County Commission for failing to repair the allegedly dangerous road conditions
 
 
 [4]
 Deposition of Charles J. Lewis at pp. 53, 147
 
 
 [5]
 In the second trial, the individual Coffee County commissioners were subpoenaed to testify as witnesses
 
 
 [6]
 A challenge ballot is a vote cast by an individual who knows that his name has been removed from the list of registered voters in the county. To vote, such an individual signs an affidavit at the polling location attesting that he knows of no reason why he is not entitled to vote there. The challenge oath contains a sworn proof of identity which states in pertinent part that "I do solemnly swear (or affirm) that I am a qualified elector of this precinct; that I have been a freeholder and householder in this precinct for one year next preceding this election." Ala.Code § 17-12-4 (1975). Alabama law requires that, before executing the affidavit, a polling inspector shall administer an oath to the person attempting to cast a challenge ballot informing him that, if he takes the oath willfully and falsely, then he is guilty of perjury and, upon conviction, may be imprisoned for not less than two years. Ala.Code § 17-12-6 (1975). These affidavits are reviewed by the Board of Registrars and forwarded to the District Attorney. Any person not qualified to vote must be taken before a grand jury
 
 
 [7]
 We will restrict our analysis to absolute legislative immunity solely because we have determined that this immunity is applicable to defendants-appellants in this case
 
 
 [8]
 See Hadnott v. Amos, 320 F.Supp. 107, 113 (M.D.Ala.1970) ("Unquestionably, a state can limit its franchise to bona fide residents."), aff'd mem., 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971), 405 U.S. 1035, 92 S.Ct. 1304, 31 L.Ed.2d 576 (1972); Gray v. Main, 309 F.Supp. 207, 216 (M.D.Ala.1968) ("A state has the power to impose reasonable residence restrictions on the availability of the ballot.")
 
 
 [9]
 The fact that this case was tried three times in state court and pursued by the Ellises in federal court indicates strong personal attachment or animus connected with the action. Whatever outside sources may have concluded and informed former Chairman Lewis of the Board of Registrars at Coy Ellis's request, Alabama law provides the statutory guidelines that the county commissioners must follow in determining voting district eligibility. As a result of having to defend against multiple litigation cases concerning the Ellises' voting eligibility in Coffee County when the commissioners had many other matters demanding their time and attention, it is not unlikely that ill feeling could have arisen. Nevertheless, absolute legislative immunity removes any consideration of motivation from determining that immunity
 
 
 [10]
 Interestingly, the district court granted summary judgment to the county commissioners in their official capacity. Despite the fact that motivation cannot be considered in legislative immunity analysis, we find that the actions relating to the Ellises removal from Coffee County voting eligibility taken by the individual county commissioners were essentially inseparable from the implementation of their legislative responsibilities. See Spallone v. United States, 493 U.S. 265, 269, 110 S.Ct. 625, 629, 107 L.Ed.2d 644 (1990) ("The city, for all practical purposes, therefore, acts through the city council when it comes to the enactment of legislation."). We also emphasize that the county commissioners were acting under and governed by the dictates of Alabama statutory law and a consent decree in determining the Ellises' qualifications to vote in Coffee County at the relevant time in question. See Wilson v. Bailey, 934 F.2d 301, 304 n. 1 (11th Cir.1991) ("It is undisputed that the Personnel Board members acted pursuant to a consent decree approved by a district judge. Thus, summary judgment was warranted."). It would be improper to analyze their actions on any other basis, such as contradictory opinions of experts requested by the Ellises or the ultimate decision of the Alabama state court after the matter was tried on three occasions. See Gray, 309 F.Supp. at 225 ("Residence, as determined by the demographic expert, and the right to vote as determined by domicile under the Alabama law, are not necessarily the same.")